Henry MELESKI, Petitioner

v.

**PENNSYLVANIA BOARD
OF PROBATION AND
PAROLE, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs May 9, 2007.

Decided July 11, 2007.

Maribeth Schaffer, Asst. Public Defender, Ebensburg, for petitioner.

Arthur R. Thomas, Harrisburg, for respondent.

BEFORE: LEADBETTER, President Judge, McGINLEY, Judge, SMITH–RIBNER, Judge, FRIEDMAN, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge McGINLEY.

 Henry Meleski (Meleski) petitions for review from a final determination of the Pennsylvania Board of Probation and Parole (Board) that denied Meleski credit[1] for his time spent at Gaudenzia First (Gaudenzia).[2]

Meleski was effectively sentenced on November 9, 2000, to a term of one year three months to three years for criminal conspiracy and corrupt organizations to be followed by seven years reporting probation. He also received a concurrent sentence of one year three months to three years for corrupt organizations to be followed by seven years reporting probation. On June 18, 2002, Meleski was paroled to Gaudenzia for an inpatient duel diagnosis treatment program.

On May 1, 2003, Meleski was arrested on drug charges by the City of Philadelphia Police Department. On June 10, 2003, the Board detained Meleski pending the disposition of criminal charges. On January 5, 2004, Meleski was sentenced to a term of two to four years for the manufacture/sale/delivery or possession with intent to deliver drugs and was concurrently sentenced to a term of one to two years for escape. In a decision recorded March 30, 2004, and mailed April 7, 2004, the Board recommitted Meleski to serve twenty months backtime or his unexpired term, whichever was less, when available as a convicted parole violator. On April 11, 2005, the Board determined that Meleski owed one year four months and twenty-one days backtime and established custody for his return on January 5, 2004, with a recomputed maximum date of May 26, 2005.

The Board scheduled an evidentiary hearing for June 28, 2005, to investigate the custodial nature of Gaudenzia and Coleman to determine if Meleski should receive credit for the time he served.

At a hearing on June 28, 2005, Meleski testified that he was strip-searched when he arrived at Gaudenzia, and placed on a thirty day "black out" period which meant he could not contact anyone or use the phone. Notes of Testimony, June 28, 2005, (N.T.) at 7–8; Certified Record (C.R.) at 36–37. Meleski was housed on the seventh floor. He could only exit the floor when everyone on the floor went downstairs for meals or to get medication. The seventh floor had a fire escape with a fire alarm and an elevator. N.T. at 8–9; C.R. at 37–38. After the thirty day "black

---

1. The Board also denied Meleski credit for time spent at Coleman Hall (Coleman). Meleski asserts in the argument section of his brief that he should receive credit for his time spent at Coleman. However, Meleski did not raise this issue in his statement of questions involved. Therefore it was waived. See Pa. R.A.P. 2116(a).

2. Our review is limited to determining whether the Board's findings are supported by sub-

stantial evidence, are in accordance with the law and whether constitutional rights have been violated. *Krantz v. Pennsylvania Board of Probation and Parole*, 86 Pa.Cmwlth. 38, 483 A.2d 1044 (1984). This Court will interfere with the Board's exercise of administrative discretion where it has been exercised in an arbitrary or capricious manner. *Green v. Pennsylvania Board of Probation and Parole*, 664 A.2d 677 (Pa.Cmwlth.1995).

out" he passed a test which indicated he knew the rules and regulations of Gaudenzia, and was allowed to use the telephone, receive visitors on visiting day, and take walks once a week with a chaperone. After sixty more days, Meleski took another test to "become a phase two," which required approval by the counselors and supervision staff. N.T. at 10; C.R. at 39. After ninety total days in the program, Meleski was allowed to attend school and return to Gaudenzia right after the conclusion of his classes. N.T. at 11–12; C.R. at 40–41. "Every time I would go out and come back you would get patted down, metal detector and so forth. So if you would go on a pass or something, you would be searched, strip-searched." N.T. at 15; C.R. at 44.

Meleski was moved from Gaudenzia to Coleman on March 7, 2003. He was placed in the "Halfway Back" program at Coleman. He went through another thirty day "black out" period at Coleman. Meleski described Coleman as more secure than Gaudenzia because there "were fences around everything." N.T. at 15–16; C.R. at 44–45.

Emmanuel Ehirim (Ehirim), director of classification for Coleman, testified that there was a two week "black out" period at Coleman. N.T. at 26; C.R. at 55. Ehirim explained that if a resident wanted to leave Coleman he was told that if he left, he would be reported as an absconder, but the resident was allowed to leave and was free to leave at anytime. N.T. at 27; C.R. at 56.

The Board determined that Meleski failed to rebut the presumption that he was at liberty on parole during his attendance at Gaudenzia and Coleman and that he failed to meet his burden to prove that his stays at Gaudenzia and Coleman were so restrictive that he was entitled to credit towards his sentence.

Meleski requested administrative review and relief and asserted that while he was in Gaudenzia and Coleman his liberty was so restricted that he remained in custody.

On October 7, 2005, the Board denied the request for administrative review:

> After an evidentiary hearing, the Board found that you: (1) did not rebut the presumption that you were at liberty on parole during your attendance at the Gaudenzia and Coleman Hall programs, (2) did not meet your burden of producing sufficient evidence to prove that the specific characteristics of Gaudenzia and Coleman Hall were restrictive enough to warrant credit, (3) did not persuade the Board that the specific characteristics of Gaudenzia and Coleman Hall constituted sufficient restrictions to your liberty during your attendance to warrant credit.... The record supports the Board's finding. (Citation omitted).

Board Decision, October 7, 2005, at 1; C.R. at 161.

Meleski contends that the Board improperly denied his request for credit for the time he spent in Gaudenzia.

Section 21.1a(a) of the Act commonly known as the Parole Act (Act)[3] provides that the Board has the authority to recommit a parolee who "during the period of parole ... commits any crime punishable by imprisonment, from which he is convicted or found guilty by a judge or jury or to which he pleads guilty or *nolo contendere* at any time thereafter...." If a parolee is recommitted under this section of the Act, he must serve the remainder of his term of imprisonment he would have had to serve had he not been paroled and does not

---

**3.** Act of August 6, 1941, P.L. 861, *as amended*, 61 P.S. § 331.21a. This section was added by Section 5 of the Act of August 24, 1951, P.L. 1401.

receive credit for time spent "at liberty on parole." Section 21.1a(a) of the Act, 61 P.S. § 331.21a(a).

The phrase "at liberty on parole" is not defined in the Act. In *Cox v. Pennsylvania Board of Probation and Parole,* 507 Pa. 614, 493 A.2d 680 (1985), our Pennsylvania Supreme Court has stated that "at liberty on parole" means "not at liberty from all confinement but at liberty from confinement on the particular sentence for which the convict is being reentered as a parole violator." *Cox,* 507 Pa. at 618, 493 A.2d at 683 (*quoting Haun v. Cavell,* 190 Pa.Super. 346, 154 A.2d 257, 261 (1959), *cert. denied,* 363 U.S. 855, 80 S.Ct. 1618, 4 L.Ed.2d 1737 (1960)).

A review of the relevant case law reveals that a determination whether a parolee is entitled to credit is very fact specific. In *Torres v. Pennsylvania Board of Probation and Parole,* 861 A.2d 394 (Pa.Cmwlth. 2004), an *en banc* decision of this Court, Jose Enrique Torres (Torres) was released on parole to a community corrections center, the Conewago–Wernersville inpatient drug and alcohol rehabilitation facility, Wernersville State Hospital (Conewago), on November 5, 2001. On January 2, 2002, Torres left Conewago without notice or permission. Torres was later sentenced to sixty days in the Northampton County Prison for possession of drug paraphernalia. The Board recommitted Torres as a convicted parole violator and established his maximum date as February 24, 2004. The Board did not credit Torres for any time spent at Conewago. Torres appealed, and the Board held a hearing.

Torres and Brandi Koppenhaver, Conewago's executive director, described the restrictions on residents. The record established that for the first forty-five days after a resident arrived at the facility, he was allowed to leave only to attend drug and alcohol rehabilitation or other authorized meetings and was driven to and from the meetings by Conewago staff. After the initial forty-five day period, residents were allowed to leave for unsupervised work or for recreational or other purposes but had to inform Conewago staff of their whereabouts and when they would return. Conewago had no fence, no internally locked doors, no window bars, no restraint devices, and residents could leave by pushing panic or pad bars on doors. If a parolee left without permission, the parole agent was notified, and the parolee was treated as a technical parole violator. The Board determined that Conewago's program was not equivalent to incarceration and denied him credit. The Board denied Torres's request for administrative relief. *Torres,* 861 A.2d at 395–396.

Torres petitioned for review with this Court. This Court reversed to the extent the Board denied credit for the initial forty-five days at Conewago:

> Under *Cox* it is not necessary that restrictions on Torres' liberty be identical to those that would exist at SCI–Camp Hill to conclude that he was not at liberty on parole. Had that been the rule intended in *Cox* the court could have simply affirmed the Board's denial of credit, for it is unlikely that any inpatient drug and alcohol treatment program would be as restrictive in all respects as conditions found in a state prison. Koppenhaver confirmed Torres' testimony that for the first forty-five days of treatment Torres was allowed to leave the premises only to attend meetings approved or ordered by Conewago; these trips occurred weekly and were under the supervision of Conewago staff. After that initial period the conditions more resembled those analyzed in other cases. . . .
>
> Based on a thorough review of case law, the Court concludes that credit must be

afforded for the initial forty-five day period of time that Torres spent at Conewago. Torres testified as follows regarding this initial period of time: 'It's like a state correctional facility because I'm over there with the state inmates another fellow and we don't go anywhere except inside the building-meetings. We don't go anywhere else. Meetings outside the community [are] under staff supervision. It's 24/7 inside the facility.'... The Board dismisses this testimony as 'self-serving,' but it was not rebutted and in fact was confirmed by Koppenhaver. The mandatory escort during this initial period plainly was intended as a coercive security measure and not merely as transportation assistance.

As the Supreme Court held in Cox, specific circumstances may constitute such restrictions on liberty as to require credit toward a sentence on recommitment. Although no formulation will apply to all potential individual circumstances, ... ordinary restrictions such as those that attend many inpatient treatment programs are not so onerous as to require a credit. The Court holds otherwise, however, when the restrictions upon a parolee become such that they destroy any sense of being 'at liberty on parole' and, consequently, meet the Cox standard. Recognizing that courts must continue to examine the factual circumstances of each case, the Court nevertheless holds that a parolee who has been forbidden generally to leave a particular inpatient drug and alcohol rehabilitation facility for a specified period for which credit is sought, who is under 24-hour supervision during the specified period and who is not permitted to make required trips outside of the facility without an escort cannot reasonably be described as being

'at liberty on parole.' (Citations omitted).

*Torres,* 861 A.2d at 400–401.

Meleski equates his experience at Gaudenzia with Torres's experience at Conewago. Here, Meleski asserts that he should be given credit for all of the time he spent at Gaudenzia or at the very least for the two "black out" periods which totaled ninety days. With respect to whether Meleski is entitled to credit for the whole time he spent in Gaudenzia, this Court recognizes three distinct periods: the initial thirty day "black out" period, the second sixty day period, and the period thereafter.

With respect to the initial "black out" period, Meleski argues that he was not permitted contact with the outside world and any attempt to leave set off an alarm. A review of Meleski's testimony indicates that during the "black out" period, he could not make phone calls or leave the building, and was restricted to the seventh floor except for meals and medication. N.T. at 7–8; C.R. at 36–37. When asked by his attorney whether there were doors on his floor, Meleski replied, "There was a fire escape. It had an alarm on it, and the elevator was pretty much the only way on and off the floor. .... They had locks for it [the elevator]. I don't know how often it was locked, but it is right in front of the staff office and it was monitored." N.T. at 9; C.R. at 38.

This Court agrees with Meleski that the conditions under which he was placed during his initial thirty day "black out" period were similar to conditions described during the "black out" period in *Torres.* In fact during the initial thirty day period, Meleski was restricted more than Torres as Meleski could not leave the building under any circumstances, escorted or not.

■ With respect to the next sixty day period, Meleski faced similar conditions. He testified that he could use the phone, receive visitors on visiting day, and go on a walk once a week with a chaperone and other residents. N.T. at 10; C.R. at 39. These conditions were not appreciably different than those Meleski experienced in the first thirty days. Although he could leave the building for a walk with a chap-erone once a week, this Court notes that Torres was also permitted to leave Conewago with an escort to go to required meetings. In fact, this Court stated in *Torres* that a parolee "who is not permitted to make required trips outside of the facility without an escort cannot reasonably be described as being 'at liberty on parole.'" *Torres*, 861 A.2d at 401.[4] This

4. The Board argues that *Figueroa v. Pennsylvania Board of Probation and Parole*, 900 A.2d 949 (Pa.Cmwlth.2006), a panel decision of this Court, controls. In *Figueroa*, Ismael Figueroa (Figueroa) had been paroled to Joseph E. Coleman Center (Center). Figueroa was subsequently arrested and convicted of new criminal charges. The Board recommitted Figueroa as a convicted parole violator and recalculated his new maximum as August 11, 2006. Figueroa petitioned for administrative review and alleged that the Board failed to credit him for the first ninety days spent at the Center during a "black out" period. *Figueroa*, 900 A.2d at 950–951.

There, as here, the Board held an evidentiary hearing. Figueroa testified that he was in custody during the "black out" period and that when he left to attend a medical appointment he was accompanied by an escort. Figueroa testified that he would have been stopped had he attempted to leave the Center without an escort. The doors were locked, there were no windows, and the Center was surrounded by a fence. Kelly Roscoe (Roscoe), a unit manager at the Center, testified that the doors were locked to keep visitors out and to monitor those going in and out of the facility. Roscoe explained that the fence which Figueroa described was designed to keep out unauthorized visitors and was erected only around the Center's recreational areas. According to Roscoe, if a parolee attempted to leave the Center, staff would advise him to remain and his parole agent would be notified if he left. Staff members did not physically restrain residents and no parolee had ever been charged with escape for leaving the Center. Roscoe testified that during the "black out" period residents could leave the facility, unescorted, in order to tend to personal business, such as a job search or to obtain funds for fines, costs, and restitution. Roscoe remembered that Figueroa left the Center unescorted though he did not remember the date. The Board determined that Figueroa failed to prove that the characteristics of the Center were sufficiently restrictive to warrant credit. Figueroa requested administrative relief which the Board denied. Figueroa petitioned for review with this Court and alleged that he was entitled to credit for his whole stay at the Center or at least for the ninety day "black out" period. *Figueroa*, 900 A.2d at 951.

This Court affirmed:

[A]n individual's subjective impression of those restrictions is not dispositive of the question of whether confinement is the equivalent of incarceration. *Detar v. Pennsylvania Board of Probation and Parole*, 890 A.2d 27, 31, n. 10 (Pa.Cmwlth.2006). The most important factors are 'whether the patient, or resident, is locked in and whether the patient may leave without being physically restrained.' Id. at 31 (citing Cox).

In this case, we agree with the Board's determination that Figueroa was not constructively incarcerated during the initial 90–day blackout period. Although the doors to the Center are locked, this is only to prevent unauthorized visitors from entering, not to prevent the residents from leaving. Staff members do not physically restrain the residents, nor are the residents charged with escape if they leave the facility.... According to the Center's unit manager, the residents are, in fact, permitted to leave unescorted during the blackout period to attend to personal business. Although Figueroa may have perceived the restrictions as confining, his subjective impressions are irrelevant, and the fact that he may have chosen not to exercise his right to leave the facility without an escort in no way strengthens his claim that he was in custody. (Footnote omitted).

*Figueroa*, 900 A.2d at 952–953.

This Court does not agree with the Board. One glaring difference between Meleski's situ-

Court must agree with Meleski that he should receive credit for this sixty day period.

■ After the conclusion of the sixty days, Meleski was allowed to leave the facility on his own to attend school. He also received day passes for Thanksgiving and Christmas. This Court agrees with the Board's determination that Meleski is not entitled to credit for time spent in Gaudenzia after the initial ninety-day period.

Accordingly, this Court affirms in part and reverses in part. This Court affirms the denial of credit for time spent at Gaudenzia after the first ninety days and for time spent at Coleman. This Court reverses the Board's denial of credit for the ninety day "black out" period at Gaudenzia and remands to the Board for it to credit Meleski with his ninety days spent in custodial restriction in Gaudenzia.

### ORDER

AND NOW, this 11th day of July, 2007, the order of the Pennsylvania Board of Probation and Parole in the above-captioned matter is affirmed in part and reversed in part. The denial of credit for the time Henry Meleski spent at Gaudenzia First after the ninety day "black out" period is affirmed. The denial of credit for the time Henry Meleski spent at Coleman Hall is affirmed. The denial of credit for the first ninety days Henry Meleski spent at Gaudenzia First is reversed. This case is remanded to the Pennsylvania Board of Probation and Parole with instructions that the Pennsylvania Board of Probation and Parole credit toward Henry

Meleski's sentence ninety days for custodial restriction. Jurisdiction relinquished.

### DISSENTING OPINION BY Judge COHN JUBELIRER.

Respectfully, I dissent. I do not agree with the majority that Meleski met his dual burdens of persuasion and production to establish that he was not "at liberty on parole" for the time he spent at Gaudenzia. In making a determination as to whether a parolee is "at liberty on parole," I disagree with the majority's application of *Torres v. Pennsylvania Board of Probation and Parole*, 861 A.2d 394 (Pa.Cmwlth.2004), that the nature of the parolee's individual day-to-day experiences controls. I would look, as the Board suggests, at the total nature of the facility pursuant to *Cox v. Pennsylvania Board of Probation and Parole*, 507 Pa. 614, 493 A.2d 680 (1985).

The purposes of a sentence of total confinement for committing a crime are punishment, incapacitation, and deterrence. (Board's Br. at 39.) Here, Meleski was not sent to a group home for any of those purposes; rather, he was sent in order to assist with his transition and reintegration back into society. As part of this transition, residents of group homes, such as Gaudenzia, are routinely permitted to leave with or without escorts to go to work or to participate in leisure activities.

"Under Pennsylvania statute and the public policy manifested therein, there is only one feature that each and every 'place of incarceration' has in common that makes them 'places of incarceration,' and that shared feature is this: a resident of that place commits the crime of escape if

ation and Figueroa's is that Meleski was not permitted to leave the facility without an escort as Figueroa was. Meleski's "black out" period was more like Torres's than Figueroa's.

he removes himself from that place without permission." (Board's Br. at 9.) While at Gaudenzia, the record supports a finding that Meleski could leave at any time without committing the crime of escape. Meleski could walk out the fire escape on his floor or leave the building without permission and, although an alarm would most likely ring, *no one would or could prevent his exit from the building.* The police would not be called and, if he was found, Meleski would not be arrested but, instead, would be considered a parole absconder. It is not legally possible to escape from parole.[1] *See* 18 Pa.C.S. § 5121. If Meleski could not be found to have committed the crime of escape, he certainly could not be considered to have been incarcerated. Therefore, the time Meleski spent at Gaudenzia was not the equivalent of incarceration but, rather, was the equivalent of being "at liberty on parole."

Furthermore, the fact that Meleski was "monitored" by staff, cameras, alarms, etc., while at Gaudenzia is not significant in this analysis. In reality, monitoring of residents does nothing to prevent a parolee from walking away from a group home if he or she desires to do so. *See Meehan v. Pennsylvania Board of Probation and Parole,* 808 A.2d 313, 316–17 (Pa.Cmwlth. 2002) (rejecting a direct violator's claim that monitoring is the equivalent of incarceration). This fact points out an important distinction between "detecting" a departure, as would happen in Meleski's case, and "preventing" a departure, as would happen in a prison environment.

Accordingly, because Meleski was not locked in at Gaudenzia, but could leave without being physically restrained, he is not entitled to credit and I would affirm the decision of the Board.

Judge LEAVITT joins in this dissenting opinion.

---

1. Section 5121(a) provides that "[a] person commits an offense [of escape] if he unlawfully removes himself from official detention or fails to return to official detention following temporary leave granted for a specific purpose or limited period." 18 Pa.C.S. § 5121(a). The term "official detention" is defined as "arrest, detention in any facility for custody of persons under charge or conviction of crime or alleged or found to be delinquent, detention for extradition or deportation, or any other detention for law enforcement purposes; *but the phrase does not include supervision of probation or parole,* or constraint incidental to release on bail." 18 Pa.C.S. § 5121(e) (emphasis added).