**Raymon HARDEN, Petitioner**

v.

**PENNSYLVANIA BOARD OF PROBATION AND PAROLE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 1, 2009.

Decided July 13, 2009.

Michael J. Romance, Asst. Public Defender, Sunbury, for petitioner.

Alan M. Robinson, Asst. Counsel, Harrisburg, for respondent.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, and PELLEGRINI, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BUTLER, Judge.

OPINION [1] BY Judge LEAVITT.

Raymon Harden petitions for review of an adjudication of the Pennsylvania Board of Probation and Parole (Board) that declined to revise the maximum sentence date it calculated for Harden after he was recommitted as a convicted parole violator. Harden contends that the Board abused its discretion by refusing to give him credit for the time he spent in two residential programs while on parole. The Board concluded that Harden's evidence did not overcome the presumption that his attendance in each residential program was time "at liberty on parole." Concluding that

the Board did not plainly abuse its discretion in reaching this conclusion, we affirm.

The background to this case follows. In April 2002, Harden was sentenced to serve three to ten years for a drug sales conviction and was sent to the State Correctional Institution at Coal Township (SCI–Coal). On April 18, 2004, Harden was paroled, subject to a special condition that he successfully complete a residential drug and alcohol treatment program at Penn Pavilion. Certified Record at 3, 4 (C.R.——). Harden did not appeal this condition. Harden entered Penn Pavilion on October 18, 2004, where he stayed until March 22, 2005, successfully completing the program. He was then released to home monitoring. However, Harden removed the electronic monitoring device, thereby violating his parole. As a result, Harden's April 2004 parole order was amended to add a new special condition. State's Exhibit 2; C.R. 70. Under this new condition, Harden entered a "Halfway Back Program" at Renewal, a facility in Pittsburgh, where he resided from June 21, 2005, to October 13, 2005. Again, Harden successfully completed the program.

On September 27, 2006, Harden was arrested. Thereafter, he was convicted and sentenced to thirty days of imprisonment. On May 2, 2007, the Board recommitted Harden as a convicted parole violator and recalculated Harden's maximum sentence date for his 2002 drug sales conviction. Harden appealed, arguing that the Board should have credited the time he spent at Penn Pavilion from October 18, 2004, through March 22, 2005, and at Renewal from June 21, 2005, through October 13, 2005, towards his 2002 sentence.

The Board conducted an evidentiary hearing at SCI–Coal, where Harden was serving his 2002 sentence. The purpose of

1. This opinion is filed in accordance with Section 256(b) of the Internal Operating Procedures of the Commonwealth Court, 210 Pa. Code § 67.29(b).

this hearing was "to determine the custodial nature of the inpatient programs at Penn Pavilion ... and Renewal." Hearing Notice, C.R. 17. The hearing examiner divided the proceeding into two parts: one addressing conditions at Penn Pavilion and the other addressing conditions at Renewal.

With respect to Penn Pavilion, Harden testified that he was not allowed to leave the building during the first 90 days for any reason. On further examination by his counsel, however, Harden stated that he was permitted to leave the facility "two or three times" for medical treatment during the first 90 days, accompanied by a staff member. Notes of Testimony 10/22/07 at 8 (N.T. ——). Harden then testified that at different points during the first 90–day period, he was allowed to leave the facility unescorted for personal errands and medical treatment; however, Harden could not recall when these trips occurred. Harden stated that after the initial 90–day period, he was allowed to make home visits; however, he explained that he had to "call in and let them know where I was or turn myself in." N.T. 12. He stated that otherwise "I would be considered escaped from the program and they would notify parole or what have you." *Id.* Harden also testified the ground floor doors and windows at Penn Pavilion were locked and alarmed, which would have alerted the staff that someone was "leaving the building without permission." N.T. 14. Harden's days at Penn Pavilion were structured in that he ate meals at regularly scheduled times and was required to attend treatment programs at specified times. Finally, Harden testified that he was "court ordered into th[e] program." N.T. 15.[2]

Martie Anderson, Chief of Programs at Penn Pavilion, testified for the Board. She explained that there is no fence around the building; residents are not locked in; doors are locked to prevent intruders from entering the building; and no staff member would ever attempt to restrain a client from leaving the facility. Anderson testified that Harden participated in two programs at Penn Pavilion: the inpatient program and the work release program. Anderson testified about the general practices at Penn Pavilion because Harden's individual records had, for the most part, been purged. She explained that the standard inpatient program runs for approximately 45 days, and it is followed by the work release program for those inpatients that have not yet had a home plan approved. Those enrolled in either program may leave the facility for "authorized work or leisure activities." N.T. 18. Those on work release come and go from the facility while they work, look for work or look for a place to live. Inpatients are allowed to leave the facility at the beginning and end of the program to conduct whatever personal business they wish, including family visits. When inpatients leave Penn Pavilion to attend medical appointments, they are escorted by staff who provide transportation assistance. Inpatients are allowed outside on the grounds of the facility, where a staff member is present. Anderson testified that Harden entered the inpatient program on October 19, 2004, and completed it on December 3, 2004, at which point he entered the work release program for the duration of his stay. Anderson stated that those who attempt to leave the Penn Pavilion facility are not charged with escape.

With regard to Renewal, Harden testified that upon admission, he was not permitted to do anything for the first 72 hours until he met with his counselor to set up

---

2. Parole orders are issued by the Board, not by a court.

his schedule. Once his schedule was established, he was allowed to come and go from the facility. Harden stated that the doors were locked and alarmed to keep people from leaving. Harden also testified that he was required to take a breathalyzer upon returning to the facility; to submit to random urine samples; and to participate in community service. Harden performed his community service both in the Renewal building and at the YMCA directly across the street.

Morris Richardson, one of the directors of Renewal, then testified. He stated that there is no fence around the facility; residents are not locked in; doors are locked on the outside to prevent unauthorized people from entering; and the staff does nothing to restrain people from leaving the facility. He testified that Harden left the facility for work each day on his own, *i.e.*, without an escort. In addition, Renewal's records showed that Harden left for medical appointments, shopping trips, home visits, trips to the Social Security office, church, community service, several different barber shops and other places. Harden had to record these trips on a schedule card, the purpose of which was to teach accountability. Richardson stated that if a resident walked out the door without approval, he would be discharged from the program but not charged with escape.

■ The Board found that Harden's stay at Penn Pavilion from October 18, 2004, through March 22, 2005, and at Renewal, Inc. from June 21, 2005, through October 13, 2005, was not the equivalent of incarceration. Accordingly, it denied Har-

den's request for credit, explaining as follows:

> The Board finds that the Parolee: (1) has not rebutted the presumption that he was at liberty on parole during his attendance at [the group homes]; (2) did not meet his burden of producing evidence to prove that specific characteristics of the [group homes] constituted restrictions on his liberty sufficient to warrant credit on the sentence from which he was on parole during his attendance; and (3) has not persuaded the Board that specific characteristics of the [group homes] constituted restrictions on his liberty sufficient to warrant credit on the sentence from which he was on parole during his attendance.

Board Decision, November 29, 2009; C.R. 72. On March 25, 2008, the Board issued its adjudication denying Harden's administrative appeal of the Board's decision and order. Harden now petitions this Court for review.[3]

Harden presents one issue on appeal, namely, that each residential program was the equivalent of incarceration and, therefore, he is entitled to credit toward his 2002 sentence for the time he spent in each program. Harden requests this Court to rule "on the specific facts of record in his situation." Petitioner Brief at 8.

The "specific facts" that Harden believes relevant to his argument were established, he argues, by his testimony. At Penn Pavilion, he was not allowed to leave the facility for 90 days; if he left for medical appointments, he was escorted; when he left the facility, there were restrictions,

---

**3.** This Court's review of an action of the Board is limited to a determination of whether the Board's findings are supported by substantial evidence, whether an error of law was committed, or whether any of the parolee's constitutional rights were violated. *Carter v. Pennsylvania Board of Probation and Parole,* 936 A.2d 155, 156 n. 3 (Pa.Cmwlth.2007). We will not interfere with a determination unless the Board has acted arbitrarily or plainly abused its discretion. *Houser v. Pennsylvania Board of Probation and Parole,* 874 A.2d 1276, 1278 n. 2 (Pa.Cmwlth.2005).

such as having to report his actions; meals, cleaning and treatment programs were scheduled each day; and the doors and windows on the first floor were locked and alarmed. With respect to Renewal, Harden argues that "much of the same restrictions were applied." Petitioner Brief at 7. In determining whether either program was the equivalent of prison, Harden notes that the deciding factors are whether the resident is locked in and whether he may leave without physical restraint. *Id.* at 8. Harden concedes that his description of Penn Pavilion was contradicted by the Board's witness, but he nevertheless believes that he proved both facilities were the equivalent of prison.[4]

The Board counters that Harden's testimony did not overcome the presumption that he was at liberty on parole while at Penn Pavilion and Renewal. It argues that Harden's evidence did not show that he was "ever subject to a rule against leaving without a mandatory coercive security escort" at either facility. Respondent Brief at 3. Accordingly, it argues that the Board did not abuse its discretion by concluding that Harden failed to prove that

either group home was "a prison equivalent." *Id.* at 2 n. 1.[5]

We begin with a review of the applicable law. Section 21.1(a) of the act commonly known as the Parole Act[6] (Act) provides, in relevant part, that the Board may recommit any parolee who, during the period of parole, "commits any crime punishable by imprisonment, for which he is convicted or found guilty...." 61 P.S. § 331.21a(a). If a parolee is recommitted, he must serve the remainder of the term which he would have been required to serve had he not been paroled, and he "shall be given no credit for the time at liberty on parole." *Id.*

■ The phrase "at liberty on parole" is not defined in the Act. Our Supreme Court has explained that "at liberty on parole" does not mean that a parolee must be actually "free" of restraint. To the contrary, a parolee can be considered "at liberty" even while in prison, so long as the parolee is not in prison for the purpose of serving his original sentence. *Hines v. Pennsylvania Board of Probation and Pa-*

---

4. Indeed, Harden contradicted himself. He testified that he could not leave Penn Pavilion for 90 days but then stated that he was allowed to leave, without an escort, from time to time.

5. This case was listed for argument *en banc seriatim* with *Pierre v. Pennsylvania Board of Probation and Parole* (Pa. Cmwlth., No. 1110 C.D.2008). The parties were directed to address the following issues at oral argument.
   1. Is a residential facility that treats parolees as well as prisoners on pre-release status necessarily a "prison equivalent?"
   2. Is a residential facility that treats private patients as well as parolees, as was the case in *Jackson v. Pennsylvania Board of Probation and Parole*, 130 Pa.Cmwlth. 527, 568 A.2d 1004 (1990), necessarily not a "prison equivalent?"
   3. What, if any, foundational evidence must be presented by a parolee to show that a particular treatment practice or rule makes

the residential facility a "prison equivalent?"
   4. Do prisons use rules similar to those rules employed by residential facilities during the "blackout period?" What is the purpose of the "blackout period?"

Order, March 23, 2009. The argument did not resolve the question of how a prison differs from (1) a residential facility for parolees who receive treatment, *inter alia*, for substance abuse or (2) from a residential facility that treats exclusively private individuals for substance abuse. All residential facilities have rules that appear restrictive. Only residents of prisons are locked in each night or prevented from leaving by armed guards.

6. Act of August 6, 1941, P.L. 861, *as amended*, 61 P.S. § 331.21a. Section 21.1 was added by Section 5 of the Act of August 24, 1951, P.L. 1401.

*role*, 491 Pa. 142, 146 n. 2, 420 A.2d 381, 383 n. 2 (1980).[7] In *Cox v. Pennsylvania Board of Probation and Parole*, 507 Pa. 614, 620, 493 A.2d 680, 683 (1985) the Supreme Court explained that "all forms of parole involve some restraint on the parolee's liberty, and non-compliance with them can result in arrest and recommittal as a technical parole violator." Stated otherwise, the imposition of restraints on a parolee's liberty is part and parcel of being "at liberty on parole."

In *Cox*, the Board argued that a parolee's attendance in a residential facility should always be considered "at liberty on parole" because it is a condition agreed to by the parolee. However, the Supreme Court declined the Board's invitation to issue a *per se* rule that all time spent in a residential facility as a condition of parole is time "at liberty on parole." Instead, the Supreme Court left the door open to a parolee to make the case that a particular residential facility is the equivalent of a prison, thereby entitling the parolee to sentence credit for time spent at that facility.[8]

However, the Supreme Court also established jurisprudential principles in *Cox* that make it difficult for a parolee to make such a case. These essential principles are as follows:

1. Because a parolee does not enter a residential facility pursuant to a court order but, rather voluntarily agrees to do so "as part of his parole program, *his attendance there is presumed to be at 'liberty on parole.'*" *Id.* at 616, 493 A.2d at 681 (emphasis added).

2. The presumption that attendance at a residential facility is "at liberty on parole" may be rebutted. However, it is the burden of the parolee to develop a factual record and to persuade the Board that the residential program he attended was a *"prison equivalent* precluding the conclusion that [the parolee] was at 'liberty on parole.'" *Id.* (emphasis added).

3. If the Board is not persuaded that the parolee did time in a "prison equivalent," *courts should "not interfere with the Board's determi-*

---

7. By the *Hines* logic, it is not the prison or its rules that determines "at liberty" but, rather, the status of being "on parole." A parolee in prison for an arrest on a new criminal act is technically still "at liberty" so long as his parole on the original sentence is not revoked.

8. Most states do not give sentence credit for time spent in a residential treatment or rehabilitation program by a probationer or parolee. Lee R. Russ, Annotation, *Defendant's right to credit for time spent in halfway house, rehabilitation center, or other restrictive environment as condition of probation*, 24 A.L.R.4th 789, 791 (1983). An exception is the State of California, which has adopted a statute that provides that "any time spent in a jail, camp, work furlough facility, halfway house, rehabilitation facility, hospital, prison, or similar situation . . . shall be credited upon [a probationer's] sentence." CAL.PENAL CODE § 2900.5; *People v. Rodgers*, 79 Cal.App.3d 26, 144 Cal.Rptr. 602 (1978) (time in a facility

was entitled to sentence credit under Section 2900.5 where, *inter alia*, male residents undergo head shaving, are banned from leaving the property for any reason for six months, and could not communicate with spouse or children for one year).

In states without a statute such as that enacted in California, the courts focus on what constitutes "creditable custody." NEIL P. COHEN, THE LAW OF PROBATION AND PAROLE, 2d. ed. § 28:11 (1999) at 28–24. The relevant factors in this focus are: whether the offender's participation was voluntary; whether the offender was free to leave; whether the facility is private or public; and whether the offender could be charged with escape if he eloped from the facility. *Id.* If the parolee agreed to enter the facility and can leave without committing a new crime, *i.e.*, the crime of escape, the parolee is generally not entitled to "creditable custody."

*nation* of that issue unless it acts arbitrarily or plainly abuses its discretion." *Id.* at 620, 493 A.2d at 683 (emphasis added).

Stated otherwise, the *Cox* principles make it difficult for a parolee to rebut the presumption that time spent in a residential facility is *not* entitled to sentence credit.

This Court's first post-*Cox* decision was *Jackson v. Pennsylvania Board of Probation and Parole*, 130 Pa.Cmwlth. 527, 568 A.2d 1004, 1006 (1990). At the facility in question, Eagleville Hospital, the parolee was free to leave without physical restraints, although the parole authorities would be contacted. Further, parolees were not locked in, and the facility was not fenced. Based on these relevant facts, we held that the Board correctly concluded that the facility was not a prison equivalent.

This Court's holding in *Meehan v. Pennsylvania Board of Probation and Parole*, 808 A.2d 313, 317 (Pa.Cmwlth.2002), is also instructive. In *Meehan*, the parolee, Meehan, sought credit for the time he spent at Keenan House, a drug and alcohol treatment facility in Allentown. Meehan argued, *inter alia*, that because some of the persons at Keenan House were pre-release inmates who got credit for their time, it was unfair and a violation of equal protection not to give him, a parolee, credit for time spent at the same facility. We rejected Meehan's argument, noting that there was a difference between parolees and pre-release inmates by reason of their status. An inmate is in "official detention," even while on leave in a facility such as Keenan House and, thus, can be charged with escape. By contrast, a parolee is not in official detention but only "under supervision" and, thus, could not be charged with the crime of escape for absconding from Keenan House. This different status, we held, justified treating pre-release inmates and parolees at Keenan House differently for purposes of sentence credit.

In reaching this conclusion, the Court looked at the statutory meaning of "official detention." 18 Pa.C.S. § 5121(e). Notably, "official detention" is *"for law enforcement purposes . . . but the phrase does not include supervision* of probation or parole, or constraint incidental to release on bail." *Id.* (emphasis added). Because Meehan was on parole, he was under "supervision" at Keenan House; he was not there for "law enforcement purposes." Meehan could have

walked through doors that were not locked in such a way as to prevent one on the inside of Keenan House from leaving and . . . no one would have tried to stop [Meehan] from walking out one of those doors.

*Meehan*, 808 A.2d at 316. However, Meehan would not commit a crime by walking through those doors.

Notably, the evidence in *Meehan* showed that the program at Keenan House was restrictive. Parolees were "closely monitored," with three head counts per day that were reported to the Department of Corrections. *Id.* at 316. The first floor doors and windows were alarmed. A parolee could not go outside, except in the company of another patient or parolee. Recognizing the deference owed to the Board, this Court held that the Board did not abuse its discretion in holding that the parolee did not prove that Keenan House was so restrictive as to constitute a prison equivalent, notwithstanding its "close monitoring." *Id.*

In *Torres v. Pennsylvania Board of Probation and Parole*, 861 A.2d 394 (Pa. Cmwlth.2004), the Board proposed that this Court adopt a "bright line" test for determining sentence credit cases. It proposed, relying on *Meehan*, that the status of the resident be determinative of credit.

The Board argued that where time spent in a drug and alcohol treatment facility was not for the purpose of law enforcement, that should end the sentence credit inquiry. This Court rejected the Board's argument, noting, *inter alia*, that *Cox* established that in these cases there can be no *per se* rule.

The Court went on to consider the evidence presented by Torres and concluded that he was entitled to credit for time spent at Conewago–Wernersville, a licensed drug and alcohol treatment facility similar to Keenan House, which had been the subject of *Meehan*. At Conewago–Wernersville, Torres was under 24–hour supervision and was not permitted to leave the building, except to attend weekly "meetings approved or ordered" and "under the supervision of Conewago staff." *Torres*, 861 A.2d at 400. Staff did not simply provide transportation assistance but, rather, functioned as a "coercive security measure." *Id.*[9]

▮▮▮ We turn to Harden's appeal. Penn Pavilion and Renewal are physically constructed in ways that this Court has held, on numerous occasions, are unlike prisons. Facilities are not prison-like if they lack fences or have fences with gates that open from the inside; have doors and windows locked from the outside, not the inside, to prevent entry not exit; lack guards stationed to prevent residents from leaving; and do not attempt to use physical force by staff members to stop an inpatient from leaving. *See, e.g., Jackson*, 130 Pa.Cmwlth. 527, 568 A.2d 1004; *Meehan*, 808 A.2d 313; *Willis v. Pennsylvania Board of Probation and Parole*, 842 A.2d 490, 491 (Pa.Cmwlth.2004). Harden's testimony about the structural conditions at Penn Pavilion and Revewal did not make his case.

▮▮▮ The central question, then, is whether the rules at each facility were so restrictive as to make the facility the equivalent of a prison. The most restrictive period at either facility was the inpatient program at Penn Pavilion. Harden emphasizes that his days were structured, noting that meals and treatment programs were held at regular times. A schedule does not make a residential treatment facility a prison equivalent. Every institution, whether a school, church, hospital or court, uses a schedule. In addition, the fact that a program uses "close monitoring" does not overcome the presumption that Harden's attendance was "at liberty on parole." *Meehan*, 808 A.2d 313.

With respect to the rules governing Harden's freedom of movement, Harden first testified that he was not allowed to leave Penn Pavilion at all, but he later conceded that he was allowed to leave for personal errands and medical appointments, but he could not remember when these trips occurred. As explained in *Figueroa v. Pennsylvania Board of Probation and Parole*, 900 A.2d 949 (Pa.Cmwlth. 2006), being able to leave a facility for personal errands is most assuredly not a feature of doing time in prison. This leaves the question of the escorts that accompanied Harden on medical appointments. Notably, Harden offered no explanation of these medical appointments and whether they were emergency appointments occasioned by accident or illness or regular check-ups scheduled well in advance.

---

9. Likewise, in *Meleski v. Pennsylvania Board of Probation and Parole*, 931 A.2d 68, 72 (Pa. Cmwlth.2007), the evidence showed that the escort exercised a "mandatory coercive" effect, as opposed to "transportation assistance." However, in *Meleski*, the use of escorts was not the deciding factor. It was also critical that the parolee could not leave the seventh floor of the facility, except for meals.

The word "escort" is subject to a variety of meanings. It could describe an armed guard or a taxi driver in the employ of the facility. Illustrative is *YellowBear v. State*, 874 P.2d 241 (Wyo.1994). In that case, the probationer was sent to an alcohol treatment facility by court order. The probationer was not permitted to leave the facility except in the custody of the sheriff. If the probationer violated any program rule, the sheriff would escort the probationer back to jail. The use of an armed escort was given substantial weight in reaching the conclusion that the probationer was entitled to sentence credit while at the facility.[10]

None of the facilities considered by this Court in prior cases have ever involved escorts by a sheriff, and none had their rules enforced by threat of immediate "escort" to jail by a sheriff. In *Wagner v. Pennsylvania Board of Probation and Parole*, 846 A.2d 187, 191 (Pa.Cmwlth.2004), this Court denied sentence credit, *inter alia*, for the reason that staff members were counselors, not law enforcement officers. Harden has provided no information that would allow a factfinder to find that staff who accompanied him on medical appointments functioned as guards, as opposed to *Wagner*-type counselors.

■ The use of "escorts" at a facility does not, in itself, show that the facility is a prison equivalent. The "escort" may be an armed law officer, a lifeguard at a pool, a person providing transportation assistance, or just another patient or parolee. Because the term "escort" can be given a wide variety of meanings, the parolee does not sustain his evidentiary burden simply by slipping the word "escort" into the rec-

ord. Instead, it is the parolee's burden to prove factually that the "escort" exercises a coercive function and does not function as a counselor, whose goal is to advance treatment or to provide transportation assistance.

Here, Anderson testified that the staff who accompany inpatients to medical appointments provide transportation assistance. Harden presented no contrary evidence. The Board did not plainly abuse its discretion or act arbitrarily in finding Harden's evidence with respect to the use of an "escort" inadequate to rebut the presumption that Penn Pavilion was not the equivalent of a prison during the most restrictive period, *i.e.*, the first 45 days. That being the case, Harden's evidence did not rebut the presumption with respect to the less restrictive periods at Penn Pavilion and at Renewal.

■ For a parolee to overcome the presumption that time spent in a residential facility is *not* the equivalent of a prison, he must do more than recite his subjective impressions. *Figueroa*, 900 A.2d at 953. The parolee must lay an evidentiary foundation. This should not be difficult since every parolee has spent time in prison. Here, Harden simply assumed that the essential quality of a prison is the use of a schedule. However, as noted, human institutions, residential or otherwise, are governed by schedules. Further, assumptions have no place in an evidentiary proceeding. The essentials of prison, as opposed to other institutional settings, is the inability to walk away without having to unlock a door; without committing a crime; and without risking physical restraint. Jack-

---

**10.** However, it was also significant that the probationer was in the program by court order and that the rule violation was enforced by an automatic return to jail. *YellowBear*, 874 P.2d at 245. A Pennsylvania parolee who violates a program rule may or may not be charged with a parole violation, and that violation may or may not result in a parole revocation.

son, 568 A.2d at 1006.[11] If there are other essentials to a prison, it is the parolee's evidentiary burden to establish them.

We recognize that this is not an easy task. Private drug and alcohol treatment facilities that do not treat parolees, but only private citizens, may also impose close supervision and restrictions on patients. Indeed, our Supreme Court has observed that a "custodial hospital environment" for treatment of alcoholism restrains the liberties of its patients. *Commonwealth of Pennsylvania v. Conahan*, 527 Pa. 199, 203, 589 A.2d 1107, 1109 (1991) (holding that the trial court did not abuse its discretion by awarding DUI defendant 30 days credit towards his minimum, mandatory sentence after spending 95 days, at his own expense, in a hospital that treated the defendant's alcoholism in a way that was restrictive of his liberties).[12]

Because of the paucity of evidence presented by Harden, there is no basis for this Court to conclude that the Board plainly abused its discretion in holding that Harden did not overcome the presumption that his time at Penn Pavilion and Renewal was time "at liberty on parole." We will not, and cannot, substitute our judgment for that of the Board under the deferential standard required by *Cox*.[13]

---

11. Harden's counsel observed at argument that prisoners on work release are allowed to leave each day unescorted to work but must return to the prison at the conclusion of the work day. There is nothing in the record about prison work release programs. Counsel made this point to argue that being able to leave a facility, such as Penn Pavilion or Renewal, is irrelevant to the question of whether the facility is prison-like. Harden argues that sentence credit should always be awarded for time spent in a residential facility as a condition of parole. First, *Cox* established that time spent in a residential facility such as Renewal or Penn Pavilion is *presumed* to be at liberty on parole. Second, prisoners on work release are locked up each night and cannot leave without committing the crime of escape. By contrast, Harden was not locked in at night at either facility.

12. The Supreme Court cautioned, however, that an individual accused of DUI has no right to expect, as a matter of routine, credit for time spent in such a facility.

13. The dissent proposes that all time spent in a residential facility, as a condition of parole, be given sentence credit for the reason that the facility is under contract with the Department of Corrections. This would be a rule easy to apply, and there may be sound policy reasons for such a rule. However, such a rule cannot be adopted unless and until the Supreme Court overrules *Cox* or the legislature amends The Parole Act.

The dissent replaces *Cox's rebuttable presumption* that a residential facility for the recently paroled is *not* a prison equivalent with an *irrebuttable presumption* that it is. *Cox* places the burden on the parolee to rebut the presumption. The dissent reduces the parolee's evidentiary burden to zero because it will be impossible to place a parolee in a facility that does not have a contract with the Commonwealth. These aspects of the dissent's proposal cannot be squared with *Cox*.

The legislature can make the policy decision to specify what constitutes "at liberty on parole." It could decide, for example, that because all parole conditions restrain liberty to some degree, parolees should be given sentence credit for each day they comply with those conditions. Notably, however, *Cox* rejected the concept that any restraint on liberty was enough to earn sentence credit. The legislature could, alternatively, decide that any parole condition that involves a residency requirement entitles the parolee to sentence credit for the duration of the residency. This is the dissent's proposal, and California, for one, has adopted such legislation. As a matter of policy, however, the parolee should be required to complete the program successfully as a condition precedent to earning sentence credit for each day in a residential facility.

The dissent argues that the Department of Corrections operates "less restrictive facilities" than a "regular prison." The record is devoid of evidence as to what constitutes a "regular prison" or a "less restrictive facility."

Indeed, it is error to "interfere with the Board's determination unless it acts arbitrarily or plainly abuses its discretion." *Cox,* 507 Pa. at 620, 493 A.2d at 683.

Accordingly, we affirm the Board.

### ORDER

AND NOW, this 13th day of July, 2009, the order of the Pennsylvania Board of Probation and Parole, dated February 5, 2008, is hereby AFFIRMED.

## DISSENTING OPINION BY Judge PELLEGRINI.

It is undisputed that Penn Pavilion is a Department of Corrections' institution operated on its behalf under contract by a private party where prisoners and parolees are placed. Contrary to our case law, the majority holds that Raymon Harden (Harden) is not entitled to any credit for time served on parole at Penn Pavilion because he was "at liberty on parole" as the restriction is not the "equivalent of incarceration" and no armed escort accompanied him when he left the facility. In so holding, the majority hollows out our Supreme Court's decision in *Cox v. Pennsylvania Board of Probation and Parole,* 507 Pa. 614, 493 A.2d 680 (1985), by suggesting that only the highest level of confinement is the "equivalent of incarceration," thereby making it impossible for a parolee to receive any credit against his sentence for time spent in halfway houses. Harden is entitled to credit because he was placed at

the same facility where prisoners are incarcerated and governed by the same restrictions, and he must be credited with that time because it necessarily is the "equivalent of incarceration." For those reasons, I respectfully dissent.

### I.

What is involved in this appeal is when a parolee is placed on probation subject to the condition that he enter a rehabilitation, treatment or a similar program, and has his probation revoked, whether the time spent in that restrictive environment should be credited against the parolee's sentence. Credit has been granted by both our Supreme and Superior Courts which have found that a DUI offender in a private alcohol center that has a restrictive environment—where the offender is required to reside at the facility during the time he participates in the program and places some restriction on the offender's freedom of movement-qualifies as "imprisonment" under 75 Pa.C.S. § 3804 (relating to penalties) and that time counts against the offender's sentence. *Commonwealth of Pennsylvania v. Conahan,* 527 Pa. 199, 589 A.2d 1107 (1991); *Commonwealth v. Usher,* 264 Pa.Super. 435, 399 A.2d 1129 (1979) (alcohol rehabilitation); *Commonwealth v. Mallon,* 267 Pa.Super. 163, 406 A.2d 569 (1979) (alcohol rehabilitation); *Commonwealth v. Jones,* 211 Pa.Super. 366, 236 A.2d 834 (1967) (mental institution).[1]

---

**1.** Many other jurisdictions permit credit for time spent in a halfway house. Whether credit is received for time a parolee spends in a halfway house is dependent on the particular statutes involved. Most cases involve a discussion of what is "custody" for the purpose of their sentencing statute. These jurisdictions have adopted the view that credit is required as participation in the rehabilitation program or treatment program and is the equivalent of being in "custody" or "jail."

That is the approach Pennsylvania courts have taken in the above cases when they have found that a person in one of those centers is "incarcerated." *See also Lock v. State,* 609 P.2d 539 (Alaska 1980); *People v. Rodgers,* 79 Cal.App.3d 26 (1978); *People v. Stange,* 91 Mich.App. 596, 283 N.W.2d 806 (1979); *People v. Kitsmiller,* 74 P.3d 376 (Colo.Ct.App. 2002); *State v. Hearst,* 356 N.C. 132, 567 S.E.2d 124 (2002). Of course, prisoners are subject to escape because they are in custody.

While those cases dealt with whether a prisoner's time in a rehabilitation center counted as time "incarcerated," what is before us is whether the time a parolee spends in a rehabilitation center is like a prisoner's and is similarly counted against his sentence. Unlike prisoners who receive time while incarcerated, parolees receive credit for all time against their sentence when they are not "at liberty on parole." The phrase "at liberty on parole" is contained in Section 21.1a(a) of what is commonly known as the Parole Act. Section 21.1a(a) authorizes the Board to recommit a parolee who, "during the period of parole ... commits any crime punishable by imprisonment, from which he is convicted or found guilty by a judge or jury or to which he pleads guilty or *nolo contendere* at any time thereafter...." If the Board recommits a parolee as a convicted parole violator under this provision, he is required to serve the remaining term of imprisonment that he would have had to serve if he had not been paroled and is given no credit for time spent "at liberty on parole." 61 P.S. § 331.21a(a).[2]

The Parole Act does not define the phrase "at liberty on parole." However, in *Cox*, our Supreme Court explained that "at liberty on parole" means "not at liberty from all confinement but at liberty from confinement on the particular sentence for which the convict is being reentered as a parole violator." *Id.*, 507 Pa. at 618, 493 A.2d at 683 (1985) (quoting *Haun v. Cavell*, 190 Pa.Super. 346, 154 A.2d 257, 261 (1959)), *cert. denied*, 363 U.S. 855, 80 S.Ct. 1618, 4 L.Ed.2d 1737 (1960). It went on to explain that there is a need to determine whether "the restrictions on [parolee's] liberty [at the rehabilitation center] were the equivalent of incarceration" entitling him to "credit for the time spent in the program." *Id.*, 507 Pa. at 620, 493 A.2d at 683.[3] One thing that *Cox*, as well as our cases makes clear, is that it is irrelevant that a parolee is not charged with escape if he leaves the facility without permission. An escape can only be charged when a person is in custody or incarcerated, while the touchstone here is not whether the parolee is in custody but was not "at liberty on parole" because he was in a facility

The question is not whether a parolee is in custody but whether he is not at liberty on parole because he is in a facility that is the "equivalent of incarceration." The majority fails to recognize that distinction.

2. 61 P.S. § 331.21a(a) provides:

(a) Convicted Violators. Any parolee under the jurisdiction of the Pennsylvania Board of Parole released from any penal institution of the Commonwealth who, during the period of parole or while delinquent on parole, commits any crime punishable by imprisonment, for which he is convicted or found guilty by a judge or jury or to which he pleads guilty or nolo contendere at any time thereafter in a court of record, may, at the discretion of the board, be recommitted as a parole violator. If his recommitment is so ordered, he shall be reentered to serve the remainder of the term which said parolee would have been compelled to serve had

he not been paroled, and he shall be given no credit for the time at liberty on parole. The board may, in its discretion, reparole whenever, in its opinion, the best interests of the prisoner justify or require his release on parole and it does not appear that the interests of the Commonwealth will be injured thereby. The period of time for which the parole violator is required to serve shall be computed from and begin on the date that he is taken into custody to be returned to the institution as a parole violator.

3. Justice Papadakos dissented, stating that "[t]his interpretation, however, ignores the plain meaning of Section 21.1 of the Parole Act, and renders the words "at liberty" as superfluous. For if the Legislature had intended this meaning, it would simply have stated that a recommitted parole violator shall be given no credit for the time." *Id.*, 493 A.2d at 684.

that was the "equivalent of incarceration," not incarceration itself.

In making that determination, "[a] review of the relevant case law reveals that a determination whether a parolee is entitled to credit is very fact specific." *Meleski v. Pennsylvania Board of Probation and Parole*, 931 A.2d 68, 71 (Pa.Cmwlth.2007). Just as in all fact specific findings, not one single finding is controlling—what you have to look at is the totality of the circumstances. Obviously, the danger in a "fact specific" approach is what facts the court considers important—in this case, what is the "equivalent of incarceration" is dependent upon the court's knowledge or lack of knowledge of what is considered incarceration by the Department of Corrections.

## II.

The facts in this case with which to compare to the facts found critical in other cases are as follows: Harden was paroled in April 2004,[4] subject to a special condition that he successfully complete a residential drug and alcohol treatment program at Penn Pavilion. He entered that facility on October 18, 2004, and successfully completed the program on March 20, 2005, when he was released to home monitoring. Because Harden was later arrested, convicted and recommitted to another State Correctional Institution, relevant to this appeal is whether he is entitled to any credit on his maximum sentence date for his original sentence for any time he spent at Penn Pavilion. Penn Pavilion is a Department community corrections facility[5] operated under contract with a private provider to provide comprehensive rehabil-itative treatment to prepare non-violent male and female prisoners and parolees for employment and re-entry into the community, including substance abuse treatment. Conditions at this correctional facility, for both parolees and prisoners, are governed by the Department of Corrections Community Correction Center Resident Handbook.[6]

Regarding Harden's time at Penn Pavilion, Marty Anderson, Penn Pavilion's Chief of Programs, testified about the general program requirements, not about Harden's time spent at the facility because Harden's file had been purged. She testified that when a parolee arrived and began the in-patient phase of the program, he would have received one 12–hour pass to go home and collect items. He would not then be allowed to leave the facility during the in-patient program, but at the end of the program, he would have received a completion pass. If he went to any medical appointments while an in-patient, he would have a staff escort. Once the in-patient phase was over, he would then move over to the work release phase where he could leave the facility without an escort to look for work.

The Pennsylvania Board of Probation and Parole (Board), relying solely on the testimony from Marty Anderson, found that the time spent at Penn Pavilion should not be counted against Harden's sentence because, "The offender could leave [the] Program at any time. The doors at . . . the facility were not locked to prevent the offender from leaving and if the offender wished to leave staff would not restrain him, but allow him to leave. If he attempted to leave the facility, staff

---

4. Harden was originally convicted for selling drugs and sentenced in April 2002 to serve three to 10 years.

5. Available at: http://www.cor.state.pa.us/ccc/cwp/view.asp?A=387&Q=131099.

6. Available at: http://www.cor.state.pa.us/ccc/lib/ccc/Resident_Handbook_2008.pdf.

would not restrain him, but would allow him to leave. If he had left, he would not have been charged with escape, but violated [sic] a parole condition." (Board Findings at 3.)

Adopting the Board's position on the only issue that it raised,[7] the majority affirms, because the "escorts" who accompanied Harden to his medical appointments during his first 45 days of his in-patient program were merely providing "transportation assistance" which were not the type of escorts who would restrain him in a prison-type setting. In doing so, it holds that unless a parolee has a "coercive escort" when he leaves a facility, he is still considered at liberty on parole even though subject to an otherwise restrictive environment. In doing so, the majority states that the residential facility has to follow a "prison paradigm" to determine whether the prisoner's placement is the equivalent of incarceration stating that "the essentials of prison, as opposed to other institutional settings is the inability to walk away without having to unlock the door; without committing a crime, and without risking physical restraint," implying that absent those factors, the parolee's stay at a particular facility is not the equivalent of incarceration.

Nowhere in our case law or in *Cox* is there any suggestion that a parolee to receive credit for time spent in residential facilities that it has to be the equivalent of a regular prison. The majority knows full well that the Department of Corrections operates less restrictive facilities, such as the one at issue here, where the prisoners are not accompanied by an armed guard when they leave that residential correctional facility.

By doing so, the majority makes it impossible for a parolee to receive credit for any time spent in a rehabilitation center because none of those facilities have or even desire to impose those types of restrictions on both prisoners and parolees. Because the majority essentially reverses our decisions in the area and hollows out the Supreme Court's decision in *Cox*, I dissent for the following reasons.[8]

### III.

In accord with our existing cases, when a fact specific analysis is used, we typically compare and contrast what were deemed to be important factors in previous cases and apply them to the case at issue. After a number of cases are decided, the important factors involved in making the determination are "bracketed" so the bench and bar can then know with some certainty if it meets the legal standard at issue—in this case, what is the equivalent of incarceration. Two previous appeals were sent *en banc* to resolve what were the important factors that made a parolee's stay at the

---

7. The Board stated "Counterstatement of the Question Involved" as:
   *According to Meleski,* where a recommitted direct violator does not prove that there was a time during which he was subject to the rule that he could not leave a group home without a mandatory coercive security escort, does the Board Act arbitrarily or plainly abuse its discretion by finding that he did not prove that the group home was "a prison equivalent?"

8. Unlike appeals from parole revocation hearings, 2 Pa.C.S. § 101, appeals as to whether a parolee properly receives credit for time against his sentence is an appeal governed by the Administrative Agency Law. 2 Pa.C.S. § 503. Our scope of review is limited to determining "whether the Board's findings are supported by substantial evidence, are in accordance with the law and whether constitutional rights have been violated." *Meleski.* Just like in any other administrative appeal, courts should not "interfere with the Board's determination of that issue unless it acts arbitrarily and plainly abuses its discretion." *Cox,* 507 Pa. at 620, 493 A.2d at 683.

facility the equivalent of incarceration. In those cases, one factor, though not the only factor that we have used to determine whether the stay was equivalent of incarceration, was that a parolee who cannot leave a facility without an escort remains "in custody" or, stated otherwise, is not "at liberty on parole." Neither of those cases requires that a coercive escort is needed to establish that a prisoner is not at liberty on parole.

In *Torres v. Pennsylvania Board of Probation and Parole,* 861 A.2d 394 (Pa. Cmwlth.2004), an inmate was released on parole to a community corrections center/in-patient drug and alcohol rehabilitation facility where, for the first 45 days, he was allowed to leave only to attend drug and alcohol rehabilitation meetings where he was driven by staff. After the first 45 days, residents could leave unsupervised for work or recreation or other purposes but had to inform staff of their whereabouts and when they would return. The facility had no fence, no window bars, no restraining devices and no internally locked doors. We reversed the Board and gave credit to the parolee for the first 45 days of his stay, noting that "the mandatory escort during this initial period plainly was intended as a coercive security measure and not merely as transportation assistance." *Id.,* 861 A.2d at 400. We explained:

> As the Supreme Court held in Cox, [not a case involving escorts] specific circumstances may constitute such restrictions on liberty as to require credit toward a sentence on recommitment. Although no formulation will apply to all potential individual circumstances, ... ordinary restrictions such as those that attend many inpatient treatment programs are not so onerous as to require a credit. The court holds otherwise, however, when the restrictions upon a parolee become such that they destroy any

sense of being 'at liberty on parole' and, consequently, meet the Cox standard. Recognizing that courts must continue to examine the factual circumstances of each case, the Court nevertheless holds that a parolee who has been forbidden generally to leave a particular inpatient drug and alcohol rehabilitation facility for a specified period for which credit is sought, who is under 24–hour supervision during the specified period **and who is not permitted to make required trips outside of the facility without an escort cannot reasonably be described as being 'at liberty on parole.'**

*Id.,* 861 A.2d at 400–401. (Emphasis added.)

More recently, in *Meleski,* an inmate attempted to get credit for time he spent at Gaudenzia and Coleman where at each facility there was a 30–day blackout period where he could not contact anyone or use the phone. At Gaudenzia after the 30–day blackout period, for the next 60 days, he could use the phone, receive visitors and he could take walks once a week with a chaperone. We held that the parolee was entitled to credit for the time he spent at Gaudenzia and Coleman during the blackout period (60 days) when he could not leave the facility, and relative to this case, he was also entitled to the time he spent at Gaudenzia for the 60 days he had to have a chaperone to take walks. "These conditions were not appreciably different than those Meleski experienced in the first 30 days. Although he could leave the building for a walk with a chaperone once a week, this Court notes that Torres was also permitted to leave Conewago with an escort to go to required meetings. In fact, this Court stated in *Torres* that a parolee who is not permitted to make required trips outside of the facility without an escort cannot reasonably be described as

being 'at liberty on parole.'" 931 A.2d at 73.

As to whether those escorts were coercive, no person from Gaudenzia testified, and the parolee in Meleski was the only party who testified regarding the fact that he had to be accompanied wherever he went, either by staff or by a Level II resident when he left the facility. (Meleski RR at 40.) There was no evidence of a coercive escort. Moreover, the dissent in *Meleski* disagreed with the notion that a chaperone was even of any import, stating the following regarding the ability to walk away from the facility:

> Furthermore, **the fact that Meleski was "monitored" by staff,** cameras, alarms, etc., while at Gaudenzia **is not significant in this analysis.** In reality, monitoring of residents does nothing to prevent a parolee from walking away from a group home if he or she desires to do so. *See Meehan v. Pennsylvania Board of Probation and Parole,* 808 A.2d 313, 316–317 (Pa.Cmwlth.2002) (rejecting a direct violator's claim that monitoring is the equivalent of incarceration). **This fact points out an important distinction between "detecting" a departure, as would happen in Meleski's case, and "preventing" a departure, as would happen in a prison environment.**

*Meleski,* 931 A.2d at 75. (Emphasis added.) [9]

What those cases show is that parolees do not have to be locked in, do not have to be subject to restraint if they attempt to leave and, as to the only issue raised here, that no coercive escort is required to find that the restrictions are the "equivalent of incarceration." Accordingly, because the single reason the Board advances to sus-

tain its position that a prisoner has to be coercively escorted has not been found to be a valid reason for not granting time on appeal, the Board abused its discretion when it found that Harden's stay at Penn Pavilion in the in-patient program was not the "equivalent of incarceration."

## IV.

With much understanding and no criticism, in appeals involving the question of what is the equivalent of incarceration, we do not always have a full and complete record of the level of incarceration and the nature of the program involved. Oftentimes, neither the Board nor the parolee is represented by counsel. In other instances, the parties do not place facts on the record because they are familiar with the penal system and just assume the courts have the same knowledge that they do. Moreover, when presenting their cases, the parties attempt to compare and contrast with our cases by examining whether and how prisoners could or could not leave the facility, if they could leave, and could they leave without an escort in attempting to convince the Board and us that the parolee's stay at a facility was the "equivalent of incarceration." That leaves us with the false impression that the comparing and contrasting facts of what is the equivalent of incarceration is that we compare the rehabilitation facility to a full-blown "prison paradigm." What has never been fully presented to us is a description of the other types of correction facilities operated by the Department of Corrections that are much less restrictive where prisoners are incarcerated prior to their release for which they receive credit for time served because they were incarcerated where

---

9. The only time the majority discusses *Meleski* is in footnote 9 where it said that the critical factor was that the parolee could not leave the

7th floor except for meals. The *Meleski* dissent belies that comment.

they can leave without having to unlock a door or fear of physical restraint.

More specifically, what has not been squarely presented to us is that one type of correctional—incarcerating—institution that the Department operates—community correction centers and facilities. At oral argument, it was conceded that the facilities that are at issue here were just those types of facilities. Residents of those facilities are prisoners transitioning from state correctional institutions back into the community or parolees who have been released but are sent to such a facility for treatment or are sent back to a halfway program because they are experiencing difficulties maintaining parole.

Like private prisons, community correction centers are operated directly by the Department and community correction facilities are operated under contract with private agencies to supplement the state centers. Both house prisoners and parolees, provide housing, meals, employment, counseling and/or treatment services to approximately 3,000 offenders statewide. Treatment programs may include Alcohol and Other Drug (AOD), Sex Offender and Mental Health.[10] Prisoners or parolees, if accepted into one of these centers, must abide by the same strict guidelines contained in a resident handbook. Under those guidelines, among other things, inmates incarcerated in those facilities are expected to secure employment, education or vocational training. State prisoners can work outside of the pre-release center during the day and the inmate may leave the institution for a period without supervision by the Department of Corrections. A fur-

lough, though, cannot exceed seven days. All the time spent in a pre-release center counts against a prisoner's sentence.

Because prisoners and parolees are subject to the same level of confinement and the same rules, and prisoners are given credit for time spent in these facilities, it would be irrational to hold that a stay at the facility is not the "equivalent of incarceration" when the Department of Corrections has determined that it is incarceration.

## V.

Accordingly, not only would I give credit for Harden's in-patient stay at Penn Pavilion based on the record before us, to forestall an ineffective assistance of counsel claim,[11] I would remand the matter to the Board to determine whether Renewal and Penn Pavilion was a community correction center or facility and, if so, credit Harden all the time spent at those institutions to the same extent that a prisoner would receive credit who was incarcerated at the same location.

For the reasons above, I respectfully dissent.

Judges McGINLEY and BUTLER join in this dissenting opinion.

---

10. Available at: http://www.cor.state.pa.us/ccc/lib/ccc/ContractingwithBCC.pdf.

11. For counsel to be ineffective, counsel's errors must be so serious that he was not acting as "counsel" guaranteed by law and his deficient performance was so serious that there is a reasonable probability that, but for his errors, the result of the revocation proceeding would have been different. *Adams v. Pennsylvania Board of Probation and Parole*, 885 A.2d 1121 (Pa.Cmwlth.2005).