Richard **WEIGLE**, Petitioner

v.

**PENNSYLVANIA BOARD OF PROBATION AND PAROLE**, Respondent.

Commonwealth Court of Pennsylvania.

Submitted Oct. 7, 2005.

Decided Nov. 18, 2005.

Timothy L. Clawges, Carlisle, for petitioner.

Arthur R. Thomas, Asst. Counsel and Victoria S. Freimuth, Chief Counsel, Harrisburg, for respondent.

BEFORE: McGINLEY, Judge, LEADBETTER, Judge, and KELLEY, Senior Judge.

OPINION BY Judge McGINLEY.

■ Richard Weigle (Weigle) petitions for review from a final determination of the Pennsylvania Board of Probation and Parole (Board) that denied Weigle credit for his time spent at Capitol Pavilion (Capitol).[1]

Weigle was effectively sentenced on March 18, 2001, to a term of six months to two years for receiving stolen property and to a consecutive term of six months to two years for theft for a total sentence of one to four years. Weigle was sentenced as a result of his violation of intermediate punishment.[2] On January 27, 2003, Weigle was paroled to Capitol in Harrisburg, a community corrections center with an alcohol or drug component. On March 25, 2003, the Board declared Weigle delinquent effective March 23, 2003. In a decision mailed August 4, 2004, and recorded July 29, 2004, the Board recommitted Weigle to serve twelve months backtime as a technical parole violator for technical violations: changing his residence without permission and his failure to complete the program at Capitol. At the same time, the Board recommitted Weigle to serve six months concurrent backtime as a convicted parole violator for disorderly conduct. The Board established Weigle's maximum date as July 23, 2006. The Board scheduled an evidentiary hearing for December 22, 2004, to determine the custodial nature of the program at Capitol from January 27, 2003, until March 23, 2003.

At the hearing on December 22, 2004, Weigle testified that when he first arrived at Capitol he was not permitted to leave. Weigle explained that during the "black out" period "[p]retty much you can't go nowhere [sic]. You just got to stay inside the facility." Notes of Testimony, December 22, 2004, (N.T.) at 5; Certified Record (C.R.) at 26. For him, the "black out"

1. Our review is limited to determining whether the Board's findings are supported by substantial evidence, are in accordance with the law and whether constitutional rights have been violated. *Krantz v. Pennsylvania Board of Probation and Parole*, 86 Pa.Cmwlth. 38, 483 A.2d 1044 (1984). This Court will interfere with the Board's exercise of administrative discretion where it has been exercised in an arbitrary or capricious manner. *Green v. Pennsylvania Board or Probation and Parole*, 664 A.2d 677 (Pa.Cmwlth.1995).

2. Section 9763 of the Judicial Code, 42 Pa. C.S. § 9763, entitled Sentence of intermediate punishment, provided through May 18, 2005, in pertinent part:

(a) **General rule.**—In imposing a sentence of intermediate punishment, the court shall specify at the time of sentencing the length of the term for which the defendant is to be in an intermediate punishment program established under Chapter 98 (relating to county intermediate punishment) or a combination of intermediate punishment programs. The term may not exceed the maximum term for which the defendant could be confined and the program to which the defendant is sentenced. The court may order a defendant to serve a portion of the sentence under section 9755 (relating to sentence of partial confinement) or 9756 (relating to sentence of total confinement) and to serve a portion in an intermediate punishment program or a combination of intermediate punishment programs.

. . . .

(d) **Sentence following violation of condition.**—The sentence to be imposed in the event of the violation of a condition under subsection (b) shall not be imposed prior to a finding on the record that a violation has occurred. Notwithstanding any other provision of law requiring notice prior to sentencing, in the event of a violation of a condition under subsection (b), the attorney for the Commonwealth may file notice at any time prior to resentencing of the Commonwealth's intention to proceed under an applicable provision of law requiring a mandatory minimum sentence.

period lasted seven days. During the "black out" period, Weigle was allowed a "smoke break" between one and four times per day in a fenced in area at the rear of the facility. After the "black out" was lifted, Weigle testified that he was permitted to leave the facility with special approval to search for a job. Initially, he was only permitted to search for a job one day per week. Once he found employment, he was required to report that he found a job and to obtain permission from Capitol to leave the facility to go to work. N.T. at 6–11; C.R. at 27–32. Weigle was subjected to another "black out" because "[t]here was a thing with some cigarettes. They found cigarettes in people's [sic] possession that were 'out of state,' and I guess whoever had these cigarettes automatically lost their jobs, and we were put on a 30–day black out period once again." N.T. at 12; C.R. at 33. The "black out" was imposed approximately one week before Weigle left the facility on his own. N.T. at 13; C.R. at 34.

Larry Early (Early), director of Capitol, testified that the doors to Capitol were locked from the outside and were not locked to prevent anyone from leaving the facility. N.T. at 17; C.R. at 38. Early explained that any resident could exit at will from the facility and that Capitol employees were trained to not prevent any resident from leaving the facility. Further, there was no fence around the facility. Early did not know whether a parolee who was "absent without authorization" was charged with escape. N.T. at 18; C.R. at 39. On cross-examination, Early admitted that when a resident left the facility without permission, Capitol would report the resident "to his parole agent for an unaccountability." N.T. at 19; C.R. at 40.

Based on Early's testimony, the Board determined that Weigle failed to rebut the presumption that he was at liberty on parole while he was at Capitol, and that he failed to meet his burden of producing evidence to prove that his stay at Capitol was so restrictive that he is entitled to credit on his sentence.

Weigle requested administrative review and relief and asserted that the restrictions on his liberty while at Capitol were sufficient to warrant credit.

On April 15, 2005, the Board denied the request for administrative review:

> After an evidentiary hearing, the Board found that Mr. Weigle ... (1) did not rebut the presumption that he was at liberty on parole during his attendance at the Capitol Pavilion Program, (2) did not meet his burden of producing sufficient evidence to prove that the specific characteristics of the Capitol Pavilion Program constituted restrictions on his liberty sufficient to warrant credit on the sentence from which he was on parole during his attendance, (3) did not persuade the Board that the specific characteristics of the Capitol Pavilion Program constituted sufficient restrictions on his liberty sufficient to warrant credit on the sentence from which he was on parole during his attendance.

Board Decision, April 15, 2005, at 1; C.R. at 50.

Weigle contends that he is entitled to be credited with the time he spent at Capitol because he was not at liberty on parole when he was required to remain at the facility for the first portion of his placement, was subject to restrictions on his ability to leave the facility, and that his freedom to move within the facility was also restricted.

Section 21.1a(a) of the act commonly

known as the Parole Act (Act)[3] provides that the Board has the authority to recommit a parolee who "during the period of parole ... commits any crime punishable by imprisonment, from which he is convicted or found guilty by a judge or jury or to which he pleads guilty or *nolo contendere* at any time thereafter...." If a parolee is recommitted under this section of the Act, he must serve the remainder of his term of imprisonment he would have had to serve had he not been paroled and does not receive credit for time spent "at liberty on parole." Section 21.1a(a) of the Act, 61 P.S. § 331.21a(a).

The phrase "at liberty on parole" is not defined in the Act. In *Cox v. Pennsylvania Board of Probation and Parole*, 507 Pa. 614, 493 A.2d 680 (1985), our Pennsylvania Supreme Court stated that "at liberty on parole" means "not at liberty from all confinement but at liberty from confinement on the particular sentence for which the convict is being reentered as a parole violator." *Cox*, 507 Pa. at 618, 493 A.2d at 683 (*quoting Haun v. Cavell*, 190 Pa.Super. 346, 154 A.2d 257, 261 (1959), *cert. denied*, 363 U.S. 855, 80 S.Ct. 1618, 4 L.Ed.2d 1737 (1960)). In *Cox*, our Pennsylvania Supreme Court remanded to determine the nature of the program in which James Cox participated and whether the restrictions on his liberty were the equivalent of incarceration so as to entitle him to credit for time served in the program. The Supreme Court further explained that the burden was on the parolee to establish that the specific characteristics of the program were sufficient to restrict his liberty to warrant credit on his recomputed backtime. *Id.*

A review of the relevant case law reveals that the entitlement to credit based on the restrictions placed on a parol-

ee is very fact specific. Recently, this Court faced this question in *Houser v. Pennsylvania Board of Probation and Parole*, 874 A.2d 1276 (Pa.Cmwlth.2005). In *Houser*, Alan T. Houser (Houser) was paroled to the Renewal Inc. Drug and Alcohol Inpatient Program (Renewal). After he spent sixty days at Renewal, Houser abandoned Renewal without permission and was declared delinquent. The Board subsequently recommitted Houser and recalculated his maximum term to expire on July 17, 2004. The recalculation order did not include any credit for time spent at Renewal. Houser appealed the recalculation order and requested credit for time at Renewal. The Board held an evidentiary hearing. Morris Richardson (Richardson), case manager and supervisor at Renewal, testified that the doors at Renewal were not locked or alarmed, there were no bars on the windows, and no fences surrounding the building. Nothing prevented a parolee from leaving the building and, if a parolee left, he was not regarded as having escaped. Richardson also explained that Houser had passes to go home and to work outside the facility without an escort, that employees were monitored coming and going, and that Renewal would report if any parolees did not return or left of their own accord. *Houser*, 874 A.2d at 1277.

Houser's testimony conflicted with Richardson's. Houser stated he was closely monitored and had to sign out to leave the facility, that headcounts were taken, permission to leave was required, he could not drink alcohol, and he needed to be at Renewal by a time certain. He conceded that he was given passes to go home and work outside the facility and was never escorted when he left Renewal. The Board determined that Houser failed to

---

**3.** Act of August 6, 1941, P.L. 861, *as amended*, 61 P.S. § 331.21a. This section was added by

Section 5 of the Act of August 24, 1951, P.L. 1401.

rebut the presumption that he was at liberty while on parole, that he failed to meet his burden of producing evidence that specific characteristics of the Renewal program constituted restrictions on his liberty sufficient to warrant credit, and that he failed to persuade the Board that specific characteristics of the Renewal program were sufficient to warrant credit. The Board relied on Richardson's testimony. The Board denied Houser administrative relief. Houser petitioned to this Court. *Houser*, 874 A.2d at 1277–1278.

This Court affirmed the Board:

Petitioner [Houser] admitted to working outside the facility; going home with a pass without being escorted; and, being permitted to walk out of the facility at any time without being stopped. In fact, Petitioner [Houser] actually left the facility before successful completion of the program without being criminally charged for the escape. Moreover, the credited evidence of Richardson indicates that: 1) the doors were not locked; 2) there were no bars over the windows or fences surrounding the facility to keep residents inside; 3) the monitor at the front door was there to track who was coming in and out of the facility; and, 4) the staff members, who only referred to the residents as 'parolees' and not 'inmates,' would not restrain the parolees from leaving but, rather, would notify the Board. Based on the evidence, we believe the Board correctly concluded that Petitioner [Houser] did not meet his burden of producing evidence to prove that specific characteristics of the Renewal program constituted restrictions on his liberty sufficient to warrant credit on the sentence from which he was on parole during his attendance.

*Houser*, 874 A.2d at 1279.

This Court reached a different conclusion in *McMillian v. Pennsylvania Board of Probation and Parole*, 824 A.2d 350 (Pa.Cmwlth.2003), *appeal dismissed as moot*, 580 Pa. 361, 861 A.2d 262 (2004), a case upon which Weigle relies. In *McMillian*, Anthony McMillian (McMillian) was placed on pre-release status on May 3, 1999, at Capitol, where he stayed until October 20, 1999, when he completed the program. He was recommitted to Capitol for engaging in assaultive behavior on July 13, 2000, and remained there until July 28, 2000. On September 26, 2000, McMillian was arrested in a domestic incident and was subsequently convicted of simple assault. McMillian was recommitted as a convicted parole violator. The Board recalculated McMillian's maximum date as December 22, 2002. McMillian contested the calculation of the date because he believed he was entitled to credit for time spent at Capitol. *McMillian*, 824 A.2d at 351.

At the hearing, Alicia Lewis (Lewis), Capitol's assistant director, testified that inmates were subject to a seventy-two hour processing period during which they were not allowed to leave the facility at all. The inmates were then assigned to a counselor, and were required to comply with the facility's rules and regulations, including mandatory participation in all programs and leisure time was based on the inmate's status and behavior. Lewis also testified that an inmate, like McMillian, who came to Capitol from a correctional institution, was in pre-release and was not technically on parole. Lewis further testified that if an inmate left without permission or refused to participate in mandatory programs, Capitol informed the Department of Corrections, and, if a parolee was returned to Capitol for violation of a condition of parole, as an alternative to immediate recommitment, Capitol filed reports with the Board. *McMillian*, 824 A.2d at

353. The Board determined that the time McMillian spent at Capitol did not entitle him to credit. The Board further denied McMillian's request for administrative relief. *McMillian*, 824 A.2d at 351.

McMillian petitioned for review with this Court which reversed:

> Having considered the extent of control authorities exercised over McMillian at Capitol Pavilion, we must conclude that the time he spent there provided sufficient restraints on his liberty as to constitute custody for purposes of time credit under Section 9760 of the Sentencing Code [42 Pa.C.S. § 9760]. Unlike the general conditional liberty of parole, a pre-release inmate or parolee confined to a community corrections center is sufficiently restrained, physically and constructively, as to be in custody.

*McMillian*, 824 A.2d at 353.

In *Wagner v. Pennsylvania Board of Probation and Parole*, 846 A.2d 187 (Pa. Cmwlth.2004), this Court limited the applicability of *McMillian* to a situation where the parolee was in pre-release status rather than on parole. In *Wagner*, Patrick Wagner (Wagner) was paroled to the inpatient program of the Diagnostic and Rehabilitation Center (DRC) in Philadelphia. After his release to the outpatient program, Wagner was arrested on new criminal charges and on parole violations. He was subsequently recommitted as a convicted and technical parole violator to serve twelve months concurrently, when available. Wagner did not receive credit for the six months he spent in the inpatient program of DRC. At a hearing Parole Agent Clinton Canada (Agent Canada) testified that during the day none of the doors at DRC were locked, and, at night, the doors were locked from the outside but had a push bar that anyone could push to exit. Agent Canada further testified that

residents left DRC "all the time", the staff had no authority to use physical force against a resident, that there were no bars on the windows, but there were head counts. *Wagner*, 846 A.2d at 188. Theodora Austin (Austin), an employee of DRC, testified that DRC did not keep the doors locked and residents were able to leave on passes when they signed out and were not escorted. She further stated that DRC staff would not stop a resident from leaving.

Wagner testified that the front door was always open but was monitored by DRC staff, he could leave only if he had permission, the doors all had alarms, and his window was surrounded by a cage so he could not exit through the window. The Board did not award Wagner credit based on the testimony of Agent Canada and Austin. *Wagner*, 846 A.2d at 189. Wagner petitioned for review with this Court which affirmed. This Court determined that *McMillian* did not control because Wagner was not in pre-release status and was actually on parole. *Wagner*, 846 A.2d at 191.

This Court addressed another factual variation in *Torres v. Pennsylvania Board of Probation and Parole*, 861 A.2d 394 (Pa.Cmwlth.2004). In *Torres*, Jose Enrique Torres (Torres) was released on parole to a community corrections center, the Conewago–Wernersville inpatient drug and alcohol rehabilitation facility, Wernersville State Hospital (Conewago). Torres was released to Conewago on November 5, 2001. On January 2, 2002, Torres left Conewago without notice or permission. Torres was later sentenced to sixty days in the Northampton County Prison for possession of drug paraphernalia. The Board recommitted Torres as a convicted parole violator and established his maximum date as February 24, 2004. The Board did not credit Torres for any time

spent at Conewago. Torres appealed, and the Board held a hearing. Torres and Brandi Koppenhaver, Conewago's executive director, described the restrictions on residents. The record established that for the first forty-five days after a resident arrived at the facility, he was allowed to leave only to attend drug and alcohol rehabilitation or other authorized meetings and was driven to and from these meetings by Conewago staff. After the initial forty-five day period, residents were allowed to leave for unsupervised work or for recreational or other purposes but had to inform Conewago staff of their whereabouts and when they were to return. Conewago had no fence, no internally locked doors, no window bars, no restraint devices, and residents could leave by pushing panic or pad bars on doors. If a parolee left without permission, the parole agent was notified, and the parolee was treated as a technical parole violator. The Board determined that Conewago's program was not equivalent to incarceration and denied him credit. The Board denied Torres's request for administrative relief. *Torres,* 861 A.2d at 395–396.

Torres petitioned for review with this Court. This Court reversed to the extent that it denied credit for Torres for the forty-five days relating to the initial period at Conewago:

> Under Cox it is not necessary that restrictions on Torres' liberty be identical to those that would exist at SCI–Camp Hill to conclude that he was not at liberty on parole. Had that been the rule intended in Cox the court could have simply affirmed the Board's denial of credit, for it is unlikely that any inpatient drug and alcohol treatment program would be as restrictive in all respects as conditions found in a state prison. Koppenhaver confirmed Torres' testimony that for the first forty-five days of treatment Torres was allowed to leave the premises only to attend meet-

ings approved or ordered by Conewago; these trips occurred weekly and were under the supervision of Conewago staff. After that initial period the conditions more resembled those analyzed in other cases. . . .

Based on a thorough review of case law, the Court concludes that credit must be afforded for the initial forty-five day period of time that Torres spent at Conewago. Torres testified as follows regarding this initial period of time: 'It's like a state correctional facility because I'm over there with the state inmates another fellow and we don't go anywhere except inside the building-meetings. We don't go anywhere else. Meetings outside the community [are] under staff supervision. It's 24/7 inside the facility.'. . . The Board dismisses this testimony as 'self-serving,' but it was not rebutted and in fact was confirmed by Koppenhaver. The mandatory escort during this initial period plainly was intended as a coercive security measure and not merely as transportation assistance.

As the Supreme Court held in Cox, specific circumstances may constitute such restrictions on liberty as to require credit toward a sentence on recommitment. Although no formulation will apply to all potential individual circumstances, . . . ordinary restrictions such as those that attend many inpatient treatment programs are not so onerous as to require a credit. The Court holds otherwise, however, when the restrictions upon a parolee become such that they destroy any sense of being 'at liberty on parole' and, consequently, meet the Cox standard. Recognizing that courts must continue to examine the factual circumstances of each case, the Court nevertheless holds that a parolee who has been forbidden generally to leave a particular inpatient

drug and alcohol rehabilitation facility for a specified period for which credit is sought, who is under 24–hour supervision during the specified period and who is not permitted to make required trips outside of the facility without an escort cannot reasonably be described as being 'at liberty on parole.' (Citations omitted).

*Torres*, 861 A.2d at 400–401.

 First, the record indicates that Weigle was not in "pre-release status" because he was not placed in the facility by the Department of Corrections but by the Board. *See Wagner*, 846 A.2d at 190. Therefore, *McMillian* does not control. Once the "black out" period ended, Weigle was allowed to leave the facility unescorted to go to work. The doors were not locked to prevent Weigle from leaving the facility. Staff members at Capitol were specifically trained not to prevent a resident from leaving the facility which was not fenced. The conditions at Capitol appear quite similar to the conditions present in *Houser*, where Houser did not receive credit for his time spent at Renewal. Therefore, this Court finds no abuse of discretion on the part of the Board when it denied him credit for time spent at Capitol when he was not subject to "black out".

 Second, with respect to the "black out" period, Weigle testified extensively regarding the conditions under which he was placed during the one week "black out" period.[4] The conditions under which

---

4. Weigle's attorney, Timothy L. Clawges (Attorney Clawges), questioned Weigle regarding the "black out" period:

Q: When you first get there are you subject to—I want to talk about the restrictions you're subject to when you get there. Once you get there, are you permitted to leave the facility?
A: No.
Q: And are you subject to any kind of special conditions as a new arrival?
A: Black out.
Q: What's a black out?
A: Pretty much you can't go nowhere [sic]. You just got to stay inside the facility.
Q: During the black out period are you permitted to leave the facility for any reason?
A: No.
Q: How long is the black out period?
A: It varies. It depends on each person's situation.
Q: Let me ask yours.
A: Mine was seven days.
Q: During that time did you leave the building for any reason?
A: No.
Q: How about if you wanted to take a walk?
A: No.
Q: Or smoke a cigarette.
A: Oh, yeah. We were allowed smoke breaks but . . .
Q: How would you get a smoke break?

A: They would announce them and we would go back inside closed—like a fenced in area.
Q: Okay. Stop there. Who would announce them?
A: The staff.
Q: So you would hear an announcement that you were permitted to have a cigarette?
A: Yeah.
Q: And were you told where to go then?
A: Yeah.
Q: Who would tell you that?
A: The staff.
Q: Were you told when the smoke break was over?
A: Yeah.
Q: How would you be told that?
A: By the staff.
Q: Do you recall how long the smoke break lasted generally?
A: Ten minutes maybe.
Q: And how many of those did you get a day?
A: It depended. Sometimes three, four. Sometimes only one, two.
Q: Okay. Were you—other than the usual restrictions that you would have been subject to after the black out period, during the black out period did you have any other special restrictions?
A: Basically, the main thing was you couldn't leave the building for any reason. That was what the black out was.
N.T. at 5–8; C.R. at 26–29.

Weigle was placed during the blackout period were quite similar to those in *Torres*. In *Torres*, this Court concluded that Torres was entitled to forty-five days credit for time spent in the Conewago program. The facts here are so similar to those in *Torres*, that this Court determines Weigle is entitled to seven days credit for the initial "black out" period at Capitol. This Court will direct the Board to credit Weigle with seven days.

██ Third, Weigle also seeks credit for a second "black out" period which occurred immediately prior to his leaving Capitol. The record is inconclusive concerning the duration of the "black out" and whether the conditions in this second period were the same as the first, other than a brief comment by Weigle.[5] It is the parolee's burden to establish that he is entitled to credit. *Cox*. When given the opportunity, Weigle failed to call any witness or introduce any records to establish the length of the second "black out." This Court is constrained to conclude Weigle failed to meet his burden of establishing the number of days of credit to which he may have been entitled. This Court determines that the Board did not err or abuse its discretion when it failed to credit him with the second "black out" period.

Accordingly, this Court affirms in part and reverses in part. This Court affirms the denial of credit for all but the first seven days Weigle spent at Capitol. This Court reverses with respect to the first seven day period and remands to the Board for it to credit Weigle with this seven days spent in custodial restriction in Capitol.

## O R D E R

AND NOW, this 18th day of November, 2005, the order of the Pennsylvania Board of Probation and Parole in the above-captioned matter is affirmed in part and reversed in part. The denial of credit for all but the first seven days Richard Weigle spent at Capitol Pavilion is affirmed. The denial of credit for the first seven days Richard Weigle spent at Capitol Pavilion is reversed. This case is remanded to the Pennsylvania Board of Probation and Parole with instructions that the Pennsylvania Board of Probation and Parole credit toward Richard Weigle's sentence seven days for custodial restriction. Jurisdiction relinquished.

---

**5.** Attorney Clawges questioned Weigle regarding his second "black out" period:

> Q: At some point later on in your stay at Capitol Pavilion, were you subject to another black out?
> A: Yes.
> ....
> Q: Do you recall when that was?
> A: About a week before I took off.
> Q: And you left Capital [sic] Pavilion on March 23, is that right?
> A: Yeah.
> Q: So it would have been March 16 or so?
> A: No, wait a minute. Them [sic] dates might be wrong.
> Q: Okay.
> A: The 23rd.
> Q: It looks as though you were there until the 23rd of March.
> A: Yeah, that would be when I left.
> Q: Okay. During that black out period, were you subject to the same conditions as you were during the very first black out period?
> A: Yes.

N.T. at 12–13; C.R. at 33–34.