Brian M. Thompson,            :
            Petitioner      :
                                   :
      v.                      :
                                   :
Pennsylvania Board of        :
Probation and Parole,         :   No. 606 C.D. 2017
            Respondent    :   Submitted: February 16, 2018

BEFORE:   HONORABLE ROBERT SIMPSON, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON       FILED: April 17, 2018

Brian M. Thompson (Thompson) petitions for review of the Pennsylvania Board of Probation and Parole's (Board) decision not to revise Thompson's maximum sentence date to credit him with the time he spent in four inpatient drug and alcohol treatment programs while on parole. Thompson contends that the Board erred by failing to credit him with the time he spent in these programs because he was sufficiently restrained to be considered in custody. Because Thompson failed to meet his burden to prove that the restrictions imposed on him during treatment were equivalent to the restrictions imposed on him during incarceration, we affirm.

## I. Background

On April 11, 2002, Thompson was sentenced to a term of 5 years to 15 years for burglary. Certified Record (C.R.) at 9. Thompson's minimum and maximum dates for this sentence were August 3, 2006 and August 3, 2016, respectively. *Id.* From October 10, 2007 through November 20, 2014, Thompson had been released on parole, recommitted as a technical parole violator, and then re-paroled from several state correctional institutions on at least six occasions.

Each time the Board released Thompson on parole, the Board subjected Thompson's release to special conditions, including, in pertinent part, the condition that Thompson receive evaluations and treatment for his drug abuse.[1] C.R. at 12, 54, 74, 77, 97, 113 & 142. Thompson, while on parole, attended four inpatient drug and alcohol treatment programs as follows: (1) Conewago Place (Hummelstown) from November 12, 2007 to March 8, 2008 and from May 8, 2008 to May 13, 2008; (2) Keenan House from August 3, 2009 to November 5, 2009; (3) Conewago Place (Pottsville) from September 26, 2011 to December 5, 2011; and (4) Gaudenzia Siena House (Gaudenzia) from July 11, 2013 to October 10, 2013 and from November 21, 2014 to January 16, 2015. Notice of Board Decision Recorded October 3, 2016 and mailed October 4, 2016, Findings of Fact (F.F.) 1A, 2A, 3A & 4A.

After discharge from Gaudenzia, on February 27, 2015, the West Manchester Township Police Department arrested Thompson and charged him with retail theft. C.R. at 144-47. Thompson pled guilty and received a sentence of one to two years' incarceration. DC16E-Sentence Status Summary at 2, C.R. at 1-2. The Board, by decision recorded October 22, 2015 and mailed November 4, 2015,

---

[1] Thompson violated his parole on several occasions, in part, due to heroin, cocaine and alcohol use.

recommitted Thompson as a convicted parole violator and recalculated Thompson's maximum sentence date to January 16, 2020. C.R. at 196-97. The Board did not grant Thompson any credit for time he spent at the four inpatient programs. C.R. at 198.

Thompson challenged the Board's decision not to credit him with time spent in treatment asserting that he was in custody, rather than at liberty on parole, given the restrictive nature of the programs. The Board conducted an evidentiary hearing to ascertain whether Thompson was entitled to credit for the time spent at these programs. At the Board hearing, Thompson and directors from the programs testified regarding the conditions at the facilities during Thompson's stays.

### A. Conewago Place (Hummelstown)

Thompson testified that during intake at Conewago Place (Hummelstown), the staff searched his person and property. Evidentiary Hearing, June 30, 2016, Supplemental Certified Record (S.C.R.) at 26A-27A. The staff explained to Thompson, during intake, that Thompson had to follow the rules and regulations of the program or face an unsuccessful discharge. *Id.*

Thompson testified that, within the facility, the doors connecting the residents' rooms were screwed shut and some of the doors were alarmed.[2] *Id.* He also testified that the windows in the residents' sleeping quarters were screwed shut. *Id.* at 27A. While at Conewago Place (Hummelstown), Thompson never left the "property for anything." *Id.* at 28A. Thompson asserted that "it was made clear, we

---

[2] Thompson explained that the doors from each room to the outside were screwed shut because the facility used to be an "old hotel or something. So each room had a door that at one point was accessible to the outside." S.C.R. at 27A-28A. However, the remaining doors at the facility were alarmed. *Id.*

3

were not allowed to leave the building without a staff escort." *Id*. Thompson further explained that if he needed a personal item, such as socks or deodorant, he provided the staff with a list to purchase the items for him. *Id*. Thompson never left the facility for a doctor's appointment because the facility had a doctor that came into the facility to provide treatment. *Id*. As a result, Thompson never left "for any personal business whatsoever." *Id*.

On cross-examination, Thompson acknowledged that, unlike his time in prison, the staff at Conewago Place (Hummelstown) did not strip search him before entering the program,[3] the staff was not armed, and the staff did not shadow or handcuff him while he was there. *Id*. at 30A-32A. Thompson admitted that he was not locked in a prison cell while staying at Conewago Place (Hummelstown), the facility did not have a razor wire surrounding it, and there were no prison guards stationed there. *Id*. at 31A. Thompson admitted that if he left the facility, the staff would contact his parole agents and police; he would be charged with a technical parole violation rather than escape. *Id* at 32A.[4]

---

[3] Thompson stated that at prison, prior to entering, he was strip-searched and had to turn in all of his clothing and personal belongings. S.C.R. at 30A. On direct-examination, Thompson testified that the facility did a "pat search" on him and that he could keep certain items such as clothing. *Id*. at 26A.

[4] The facility director of Conewago Place (Hummelstown) also testified; however, on cross-examination, she admitted that she was not employed at the facility in 2007 when Thompson resided at the program. S.C.R. at 36A. Upon review of the Board's findings, Thompson's testimony supported its findings regarding his time at Conewago Place (Hummelstown). Thus, a review of the facility director's testimony is not necessary.

## B. *Keenan House*

Thompson testified that upon arrival at the Keenan House, the staff searched his person and property. S.C.R. at 11A. Thompson explained that the facility is a three-story building. *Id*. at 13A. The front door on the first floor has a buzzer to buzz residents, including Thompson, in and out of the building. *Id*. The facility has doors with alarms on them; if Thompson opened the front door from inside the building, an alarm would sound. *Id*. Thompson witnessed two people exit through the doors; one of those individuals was charged with sudden false alarm. *Id.*

Thompson left the facility roughly 8 to 10 times during his treatment for various reasons, including to sign up for benefits at the Veterans Administration and to do community service. *Id*. at 14A-16A. When Thompson left the facility, senior peer members, who were residents that had been in treatment for a longer period of time, escorted him. *Id*.

The admissions director of the facility, Diane Hopkins, also testified. Ms. Hopkins explained that all the doors to the facility were locked from the outside to prevent individuals from entering. *Id*. at 18A. Because the doors are locked from the outside, any resident could leave the facility at any time of his or her own free will. *Id*. Staff at the facility could not restrain or stop a resident from leaving. *Id*. There is no fence around the facility. *Id*.

Ms. Hopkins explained that, during their stay, residents are allowed, at times, to leave the facility unescorted by staff to conduct business or for leisure. *Id*. at 19A. In addition, residents could walk around the grounds and inside the facility without an escort. *Id*. The facility is located on a city street in Allentown so the residents could walk outside and sit in front of the building on a bench along Sixth Street. *Id*. at 21A. The facility had cameras inside to monitor residents but there

were no cameras on the outside of the facility. *Id*. at 22A. Ms. Hopkins noted that the Keenan House has residents who are there as a result of the criminal justice system and also residents who enter voluntarily. *Id*. at 23A.

## C. *Conewago Place (Pottsville)*

Thompson testified that upon intake to Conewago Place (Pottsville), staff searched his person and property. Evidentiary Hearing, September 16, 2016, C.R. at 272. Thompson explained that the staff took items from him such as his cell phone, identification, wallet and keys and locked those items in storage. *Id*. After Thompson completed the medical intake, which included blood and urine tests, the staff returned some of his property to him including clothing and cosmetics. *Id*. at 273. The program was housed in a four to five story building with security cameras throughout the interior and exterior of the facility. *Id*.

When Thompson left the facility to attend alcoholics anonymous (AA) meetings, to go to the hospital, and for leisure time on the grounds, at the YMCA or a park, he was escorted by staff. *Id*. at 273-74. The facility did not provide Thompson with passes for leisure time or to visit his family. *Id*. Thompson explained that he did not go to the store because "all that stuff was taken care of by the facility." *Id.* at 274.

Thompson testified that the staff performed random searches of his person, property and room. *Id*. at 276. Thompson had to submit to random urine screens. *Id*. However, Thompson clarified that the staff could not do strip or pat searches of the residents. *Id*. The program was very structured as there were specific times for various activities: wake up time, shower time, meal time, lights out time, phone time and mail time. *Id*. at 277-78.

6

The clinical director of the facility, Stefanie Wenrich, also testified. Ms. Wenrich explained that the facility does not have bars on the windows, although there are locked doors to prevent suicides given the multiple stories of the facility. *Id*. at 281. The facility has no fence around it. *Id*. at 281-82. There is nothing on the front door of the facility to prevent a resident from leaving. *Id*. at 283. Ms. Wenrich explained that Thompson could leave the facility of his own free will and staff could not restrain him from leaving. *Id.* at 280.

Ms. Wenrich testified that the program also treated residents placed there through medical assistance or private insurance. *Id*. at 283. The staff treated private placement residents in the same manner as parole placement residents. *Id.* Although pre-release inmates participated in the program during Thompson's stay, these individuals did not comprise the majority of the resident population. *Id*. at 294. Pre-release inmates were under the same restrictions as parolees because all the residents were treated the same. *Id*. at 294.

## D. Gaudenzia

Thompson testified that, during intake at Gaudenzia, the staff searched him but performed no strip searches. S.C.R. at 39A. Thompson had to surrender his wallet, money, keys, identification and cell phone. *Id.* Staff allowed Thompson to keep some personal property, such as clothing and hygiene products. *Id*.

When Thompson left the facility to go to the hospital, he was escorted by a senior resident member. *Id*. at 40A. During AA meetings or recreation breaks on the grounds of the facility, he was escorted by staff. *Id.* If a resident left the facility, without permission, an alarm sounded and staff performed a standing count to ascertain who left. *Id*. at 41A. The facility had cameras inside and outside the

7

property. *Id.* Thompson asserted that the staff monitored the residents, performed room searches and administered urine tests. *Id.*

On cross-examination, Thompson testified that the facility had no razor wire around it, no prison guards and no armed staff. *Id.* at 42A. Thompson was not shackled or handcuffed or locked in a prison cell during his stay. *Id.* If Thompson left the facility without completing the program, he would not be charged with escape but a parole violation. *Id.* at 43A.

The admissions director of the facility, Shawna Evans, also testified. Ms. Evans explained that Gaudenzia is an inpatient treatment program and that the level of treatment requires the residents' movements to be restricted. *Id.* at 44A-45A. Staff escorted residents to their appointments for the purpose of transporting them, not for security purposes. *Id.* at 45A. When Thompson had to go to the hospital, the facility sent a resident with him to help ensure that he did not use drugs while participating in the program. *Id.*

Based on the evidence presented, the Board concluded, by decision recorded on October 3, 2016 and mailed on October 4, 2016, that Thompson did not meet his burden of proving that the programs were the equivalent of incarceration. Thus, the Board did not credit him with the requested time spent at the facilities. Board's Decision at 6, C.R. at 306. On October 28, 2016, Thompson submitted a request for administrative review of its decision, which the Board denied on April 21, 2017. C.R. at 308-13. Thompson petitioned this Court for review.[5]

---

[5] This Court's scope of review is limited to determining whether necessary findings of fact were supported by substantial evidence, whether an error of law was committed or whether constitutional rights were violated. *Detar v. Pennsylvania Board of Probation & Parole*, 890 A.2d 27, 29 n.3 (Pa. Cmwlth. 2006).

8

## II. Discussion

On appeal, Thompson asserts that the Board erred by incorrectly calculating his maximum sentence date because he was in custody, not at liberty on parole, during the time he spent at the programs. Thompson asserts that he was in custody while in the programs because: he was "generally" forbidden to leave the facilities; when he left the facilities, he had to be accompanied by an escort; he was under 24-hour supervision; he was housed with pre-release inmates and the programs applied the same rules and restrictions to him as a parolee that applied to the inmates; and his room and person were subjected to searches for "contraband." Thompson's Brief at 17 & 21.

Section 6138(a) of the Prisons and Parole Code provides that a parolee who is recommitted as a convicted parole violator, as Thompson was here, "shall be reentered to serve the remainder of the term which the parolee would have been compelled to serve had the parole not been granted and . . . shall be given no credit for the time *at liberty on parole*." 61 Pa. C.S. § 6138(a)(1) & (2) (emphasis added).

The Prisons and Parole Code does not define the term "at liberty on parole." The Supreme Court in *Cox v. Pennsylvania Board of Probation & Parole*, 493 A.2d 680 (Pa. 1985) construed the language at liberty on parole and concluded that there may be instances where a parolee can obtain credit against his sentence for time spent in an inpatient treatment program while on parole. However, because the parolee agrees to attend the program as a condition of his or her parole, there is a presumption that the parolee is at liberty on parole while in treatment. *Id*. at 681. The parolee must overcome this presumption by proving that the specific characteristics of the program constitute restrictions on the parolee's liberty sufficient to warrant credit against his or her original sentence. *Id*. To do this, the

9

parolee has the burden to develop a factual record and persuade the Board that the program he or she attended was the "equivalent of incarceration." *Id*. at 683. If the Board is not persuaded that the parolee's time at the program is a prison equivalent, the courts should not interfere with the Board's determination unless the Board acted arbitrarily or plainly abused its discretion. *Id*.

Thompson agrees that the parolee has the burden to show that the program is the "equivalent of incarceration" as required by *Cox*. However, Thompson contends that "equivalent of incarceration" does not mean that the program must be "identical to incarceration." Thompson's Brief at 20 (emphasis in original). In support of his argument, Thompson relies on this Court's decision in *Torres v. Pennsylvania Board of Probation & Parole*, 861 A.2d 394 (Pa. Cmwlth. 2004).[6]

In *Torres*, this Court held that the parolee was entitled to credit for the initial 45-day black-out period he spent in the Conewago (Wernersville) inpatient drug and alcohol treatment program because the restrictions of the program destroyed "any sense of being at liberty on parole." *Id*. at 401. The program forbade the parolee from leaving his facility for the initial 45 days of his stay during which he was under 24-hour supervision. *Id*. at 400. Also, during that time, the parolee was not permitted to make required trips outside the facility without an escort. *Id*. The executive director of the facility testified that the restrictions placed on the

---

[6] Thompson also cites this Court's decision in *Weigle v. Pennsylvania Board of Probation & Parole*, 886 A.2d 1183 (Pa. Cmwlth. 2005), noting that this Court followed the same reasoning set forth in *Torres* to conclude that the parolee was entitled to credit for some time spent in a program.

parolee were "intended as a coercive security measure and not merely as transportation assistance." *Id*.

Since *Torres,* this Court has examined a variety of programs and applied the *Cox* standard to determine whether credit for time spent in a program is warranted.[7] Although it is a very fact specific determination, the two most important factors that must be considered to determine whether a program is sufficiently restrictive on a parolee's liberty to be deemed the equivalent of incarceration are: (1) whether the parolee is locked in and (2) whether the parolee may leave without being physically restrained. *Medina v. Pennsylvania Board of Probation & Parole*, 120 A.3d 1116, 1121 (Pa. Cmwlth. 2015).[8]

## III. Analysis

Upon review of the record, the Board's findings regarding the conditions at the programs are supported by the evidence. Further, the Board's findings support its conclusion that Thompson did not meet his burden of proving that the programs were the "equivalent of incarceration." The Board's findings and the record established that: Thompson could leave the programs as he was not fenced or locked in; he would not be charged with a crime if he left without permission; and he would not be physically restrained if he attempted to leave.

---

[7] *See Harden v. Pennsylvania Board of Probation & Parole*, 980 A.2d 691 (Pa. Cmwlth. 2009); *Figueroa v. Pennsylvania Board of Probation & Parole*, 900 A.2d 949 (Pa. Cmwlth. 2006); and *Wagner v. Pennsylvania Board of Probation & Parole*, 846 A.2d 187 (Pa. Cmwlth. 2004).

[8] In *Medina*, this Court held that Medina was at liberty on parole while at a community corrections facility because: he was permitted to leave the facility without an escort; he was not locked in the facility; his room was not locked at night; and he was permitted to travel to other parts of the building unescorted. *Medina*, 120 A.3d at 1121.

11

Specifically, at Conewago Place (Hummelstown), the Board found that the facility had no fence, prison guards or towers. F.F. 2L & 2M; S.C.R. at 29A-31A. While at the program, Thompson was not locked in a prison cell. Board Decision at 6; S.C.R. at 31A. If Thompson left the facility, he would be charged with a parole violation, rather than escape.[9] F.F. 2O; S.C.R. at 32A. Although Thompson never left the facility during his stay, F.F. 2G, Thompson did not produce evidence to show that the program prohibited him from leaving the facility for a specific time frame or that he was under 24-hour supervision as was the case with the parolee in *Torres*.

Thompson further asserted that "it was made clear, we were not allowed to leave the building without a staff escort." S.C.R. at 28A. However, this Court has explained that with respect to staff escorts, "it is the parolee's burden to prove factually that the 'escort' exercises a coercive function and does not function as a

---

[9] The program at issue here, Conewago Place (Hummelstown), is similar to the program this Court examined in *Jackson v. Pennsylvania Board of Probation & Parole*, 568 A.2d 1004 (Pa. Cmwlth. 1990). In *Jackson*, this Court held that the inpatient program at Eagleville Hospital did not have sufficient custodial aspects to characterize the time the parolee spent there as time spent in custody. The program had the following characteristics as explained by the Court:

> [t]he doors to the hospital are not locked, there is no fencing around the facility, and the hospital does nothing to stop patients from leaving. Additionally, the hospital does not treat parolees differently than other patients with the exception that, if a parolee were [sic] to leave the hospital before completing the program, the hospital would notify the parole authorities.

*Id.* at 1006; *see also Harden*, 980 A.2d at 699 (noting that, on numerous occasions, this Court has held that facilities for treatment are unlike prisons if the facilities: "lack fences or have fences with gates that open from the inside; have doors and windows locked from the outside, not the inside, to prevent entry not exit; lack guards stationed to prevent residents from leaving; and do not attempt to use physical force by staff members to stop an inpatient from leaving.") (citations omitted).

counselor, whose goal is to advance treatment or to provide transportation assistance." *Harden,* 980 A.2d at 700. Thompson put forth no evidence regarding the role of the staff escorts and whether they were intended as a coercive function. [10]

With respect to the Keenan House, the Board found that any resident could leave the facility at any time of his or her own free will. F.F. 1H; S.C.R. at 18A. Staff could not stop a resident from leaving and there was no fence. F.F. 1I; S.C.R. at 18A. Residents could walk around the facility, inside and outside, without an escort. F.F. 1J; S.C.R. at 19A. Thompson could open the front door, and while he was there, he witnessed two residents leave. F.F. 1F; S.C.R. at 13A. Thompson testified that he left the facility on several occasions while escorted by other senior residents. S.C.R. at 15A-16A. [11]

At the Conewago Place (Pottsville), Thompson could leave the facility at his own will and the staff could not restrain him. F.F. 4I; C.R. at 280. The facility had no fence. F.F. 4J; C.R. at 281. Although the doors are locked, the program locked them for treatment purposes to prevent suicides given the height of the

---

[10] Moreover, the fact that Thompson chose not to leave the facility does not strengthen his claim that he was in custody. While Thompson may have perceived that the restrictions at the programs were confining, his subjective impressions are not relevant. *See Figueroa*, 900 A.2d at 953.

[11] This Court considered a Keenan House program similar to this program in *Meehan v. Pennsylvania Board of Probation & Parole*, 808 A.2d 313 (Pa. Cmwlth. 2002). In *Meehan*, this Court held that the parolee failed to meet the burden of proving that the restrictions at the Keenan House were so restrictive as to constitute the equivalent of prison because, as the Board found, the parolee was not locked in and could walk out the front door and nobody would have been authorized to stop him. *Id.* at 316-17. This Court concluded that the Board's facts were supported by the evidence and added that if the parolee left the facility, the parolee would be considered a parole absconder rather than an escapee. *Id.*

13

building.[12] C.R. at 282; *See* F.F. 4L. Although Thompson was escorted by staff to attend AA meetings and for leisure time, F.F. 4E, C.R. at 273-74 & 283, Thompson produced no evidence showing that the staff escort was for coercive security measures. *See Torres*, 861 A.2d at 400.

Thompson further asserts that he was subject to the equivalent of incarceration because, at Conewago Place (Pottsville), he was housed with pre-release inmates and subjected to the same rules and restrictions as the inmates. Thompson's Brief at 22-23. This Court, however, has indicated that the comparison of restrictions on pre-release inmates to parolees is not a pertinent factor to consider in the analysis because the test is whether the restrictions placed on Thompson while in the programs infringed on his liberty sufficient to render him in custody.

Specifically, in *Meehan*, this Court addressed the argument concerning the comparison of restrictions imposed on pre-release inmates to parolees by noting that:

> a parolee in an in-patient treatment program like Keenan House is not deemed in official detention, but rather at liberty on parole. Therefore, a parolee cannot be charged with escape for leaving Keenan House. As such, parolees, who are at liberty on parole while at Keenan House, are not similarly situated with pre-release inmates, who are deemed to be in *official detention,* for purposes of credit for time spent at Keenan House.

---

[12] The Board's finding of fact provided that the "windows were locked for suicide prevention due to the height of the building." F.F. 4L. The record supports the finding that the doors, rather than the windows, were locked for this purpose. Ms. Wenrich, the clinical director of the facility, testified about the doors and windows and the program's goal to prevent suicides. C.R. at 281. The Board found Ms. Wenrich's testimony to be credible. Ms. Wenrich explained that Thompson did, in fact, leave the facility for leisure activities and there was nothing on the front door to prevent him from "walking out the front door." *Id*. at 282-83.

*Meehan*, 808 A.2d at 317-18 (citation omitted) (emphasis in original). This Court recently reviewed and rejected this argument again in *Provance v. Pennsylvania Board of Probation & Parole* (Pa. Cmwlth., No. 547 C.D. 2017, filed March 15, 2018), slip. op. at 7 (explaining the distinction that "pre-release inmates who leave a facility without permission and do not return are charged with the crime of escape by the police, whereas parolees who leave a facility without permission and do not return are charged with violating the terms of their parole by their parole agent.") (citations omitted).[13] Finally, this Court noted in *Medina* that even if the parolee is placed under *greater restrictions* than pre-release inmates in certain limited circumstances, it is irrelevant to his burden of proving that the restrictions on his liberty rose to the level of incarceration. *Medina*, 120 A.3d at 1123 (emphasis added).

At Gaudenzia, the Board found that a senior resident member escorted residents to hospitals and that staff members escorted residents for breaks. F.F. 3D & 3E. If Thompson left the program, he would be charged with a parole violation, not escape. F.F. 3K; S.C.R. at 43A. The program was restrictive due to the level of care and treatment provided, not for security measures. F.F. 3L; S.C.R at 44A-45A.

Finally, Thompson asserts that in all of the programs, he was subject to random suspicion-less searches of his person and property. Thompson's Brief at 21. The Board found that Thompson's person was searched upon intake at several of the facilities and that, while at Conewago Place (Pottsville), he was subject to random searches of his person and property. F.F. 2B, 3B, 4B & 4F. When determining whether the program is the equivalent of incarceration, this Court does not consider

---

[13] An unreported panel decision of this Court, issued after January 15, 2008, may be cited for its persuasive value when relevant. Section 414(a) of the Commonwealth Court Internal Operating Procedures, 210 Pa. Code § 69.414(a).

suspicion-less searches of person and property as a factor; searches do not transform the parolee's residency into custody for purposes of credit. *Medina*, 120 A.3d at 1125 n.6 (citations omitted).[14]

Here, the Board's findings support the conclusion that Thompson is not entitled to credit for the time spent in the programs because the conditions were not sufficiently restrictive so as to be the equivalent of prison. Therefore, we conclude that the Board did not act arbitrarily or abuse its discretion when it denied Thompson credit on his sentence for the periods of time he resided at Conewago Place (Hummelstown), Keenan House, Conewago Place (Pottsville) and Gaudenzia while on parole.

Accordingly, we affirm.

_____
CHRISTINE FIZZANO CANNON, Judge

---

[14] This Court recently rejected this argument again in *Johnson v. Pennsylvania Board of Probation & Parole* (Pa. Cmwlth., No. 2009 C.D. 2015, filed July 18, 2016), slip. op. at 8-10, because the proper test is restrictions upon the parolee's liberty.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Brian M. Thompson,           :
          Petitioner      :
                             :
          v.               :
                             :
Pennsylvania Board of     :
Probation and Parole,     :   No. 606 C.D. 2017
          Respondent   :

## O R D E R

AND NOW, this 17th day of April, 2018, the order of the Pennsylvania Board of Probation and Parole denying administrative relief dated April 21, 2017 is AFFIRMED.

 

 

_____
CHRISTINE FIZZANO CANNON, Judge